UNITED STATES of America,
Plaintiff–Appellee,

v.

J. Marshall BROWN,
Defendant–Appellant.

No. 79–5171.

United States Court of Appeals,
Fifth Circuit.

Jan. 19, 1981.

Rehearing and Rehearing En Banc
Denied March 5, 1981.

Mark J. Kadish, Rhonda A. Brofman, Atlanta, Ga., for defendant–appellant.

Julie E. Carnes, Asst. U. S. Atty., Atlanta, Ga., for plaintiff–appellee.

Before GEE and RANDALL, Circuit Judges, and LYNNE *, District Judge.

RANDALL, Circuit Judge:

J. Marshall Brown was convicted on June 6, 1977, after a jury trial in the United States District Court for the Northern District of Georgia, of knowingly causing a fraudulently obtained check to be transported in interstate commerce in violation of 18 U.S.C. § 2314. During Brown's trial the court upheld, over his objection, a claim of marital privilege by James A. Heinritz, the state's chief witness, as a result of which the defense was unable to introduce certain testimony of Heinritz's former wife as to conversations that took place between them during their marriage. Although the court denied alternative motions for a mistrial and for a directed verdict of acquittal, offered because of the court's exclusion of Mrs. Heinritz's testimony, it entered an order *sua sponte* on July 11, 1977, in which it conditionally set aside the jury verdict of guilty. In particular, the court ordered that a judgment of acquittal be entered

unless the court received, within thirty days, a waiver by Heinritz of his marital privilege; if the waiver was received, a new trial was to be held. The government appealed from this order. In *United States v. Brown*, 587 F.2d 187 (5th Cir. 1979), we held that the district court's order was beyond its power (insofar as it ordered a new trial after more than a month had passed without the filing of a motion for a new trial) and beyond its authority (insofar as it granted a judgment of acquittal despite the sufficiency of the evidence); we therefore vacated the district court's order and remanded the case for entry of judgment of conviction and sentencing. On February 27, 1979, the district court sentenced Brown to three years of probation with the special condition that he pay a fine of $5,000.

Because of the procedural posture of this case in the original appeal, we did not reach the merits of the evidentiary issue raised by Heinritz's claim of marital privilege. 587 F.2d at 190. But Brown now appeals his conviction in the district court; his argument–that the district court erred when it upheld Heinritz's claim of marital privilege–is now properly before us. In particular, Brown argues (1) that the privilege should have been denied because of Brown's Sixth Amendment right to confront the witnesses against him; (2) that the exercise of the privilege in this case violated his Fifth Amendment right to due process of law; and (3) that Heinritz waived the privilege. After reviewing the facts and considering these arguments in turn, we conclude that Brown's conviction should be affirmed.

## I. THE FACTS

Brown and Heinritz were charged together in a one–count indictment for transporting a fraudulently obtained check in interstate commerce. At the time of the offense charged in the indictment, Brown was the president and owner, and Heinritz was the executive vice–president and manager, of two insurance agencies. In brief, the in-

---

* District Judge of the Northern District of Alabama, sitting by designation.

dictment alleged that the two had devised a scheme to finance an existing indebtedness on expired insurance policies by submitting a false application to an agency in the business of financing insurance premiums; the financing agency approved the application, and Heinritz picked up the check for the proceeds of the loan and returned it (across state lines) to the office of Brown's insurance companies. Heinritz pled guilty and, prior to his testimony in this case, was sentenced to a term of probation.[1]

Heinritz was the key witness in the government's case against Brown. Heinritz testified in some detail to the facts behind the formation and execution of the scheme alleged in the indictment, and to Brown's involvement in it. "The gist of Heinritz's testimony was that Brown had created the plan upon which Heinritz had acted, and that he had cooperated with Brown only out of a fear for his personal safety, an apprehension allegedly caused by threats made to him by Brown." *United States v. Brown, supra,* at 189.

In an attempt to impeach Mr. Heinritz, Brown called Mrs. Heinritz (Mr. Heinritz's former wife, who had been married to him during the events in question) to the stand. The prosecutor immediately requested a bench conference, and, along with defense counsel, held an off–the–record discussion with the court. Thereupon the jury was excused and the prosecutor and the defense counsel argued on the record whether Mr. Heinritz could validly claim a marital privilege in order to prevent his wife from testifying for the defense about private communications between them. Trial Transcript at 261–66. The court recessed for a time during this argument; on the basis of the discussion which took place after the recess, it appears that during the break the judge proposed, and the parties agreed, to allow the defense counsel to examine Mrs. Heinritz on the record but in the absence of the jury, after which the court was to inquire whether Mr. Heinritz wished to assert the

privilege. In the event that the court upheld the privilege, this examination was to serve as an offer of proof. Trial Transcript at 264–66. After the testimony of Mrs. Heinritz, the court explained to Mr. Heinritz that the conversations to which his wife had testified were confidential marital communications and were therefore privileged, and asked him whether he wished to assert his privilege. Mr. Heinritz replied that, upon the advice of his attorney, he would in fact claim the marital privilege. Trial Transcript at 281.

Mrs. Heinritz's testimony–as taken in Brown's offer of proof–contains two statements which Brown sought to use to impeach the truthfulness of Mr. Heinritz's testimony against him. First, Mrs. Heinritz stated that her husband had told her that he had lied to the grand jury about an important part of his story. Both before the grand jury and during Brown's trial, Mr. Heinritz testified that he had had a change of mind after picking up the check from the premium financing agency and had decided to return it. He failed to return it, so he testified, only because of his fear of Brown. As Mr. Heinritz stated at trial:

> [Brown] said to me, "where is that check from Agency Premium Services?" And I said, "It is in my desk," and he said, "Well, I want to see it." . . . I hesitated because this meant that I wouldn't have the opportunity to do what I planned, was to type a short letter of transmittal and then return it to Atlanta . . . . So, I hesitated and Mr. Brown stated, "Don't just stand there. I want to see that check, and if you don't get it," he said, "I won't have the boys kill you, I'll have them break your knee caps so you will never walk again."

Trial Transcript at 65–66. Mr. Heinritz was later asked whether he had in fact told his wife that his testimony before the grand jury as to Brown's physical threat against him was perjured. He admitted having dis-

---

1. For a more detailed explanation of the facts of the offense, see *United States v. Brown,* 587 F.2d 187 (5th Cir. 1979).

cussed the matter with her but denied having made such a statement. Trial Transcript at 144–45. According to Mrs. Heinritz, however, Mr. Heinritz had told her that the statement about Brown's threat was untrue. As she stated during the offer of proof:

THE WITNESS [Mrs. Heinritz]: He [Mr. Heinritz] had flown to Atlanta in the morning and when he came back that night, it was late, after supper, perhaps ten o'clock. But I'm guessing. And he had been drinking, I presume that he had been drinking on the plane on the way back, and he came in and sat down and told me–I said, "Well, how did it go?" And he said he had lied before the Grand Jury.

Q. [By defense counsel]: ... Did he characterize the lie to the Grand Jury as relating to a statement that Mr. Brown had threatened him?

A. Yes. In that particular, he said that he had lied.

The second statement which Brown sought to use to impeach Mr. Heinritz involves the purpose for which Mr. Heinritz had entered the federal government's Witness Protection Program. On cross–examination, defense counsel sought to get Mr. Heinritz to admit that he had told his wife that he had entered the program not for protection against Brown, but instead to make his story more believable. Mr. Heinritz's answer was, however, limited to the following:

THE WITNESS [Mr. Heinritz]: ... I told my wife that a plea of guilty was required in order to enter the Witness Protection Program which would, in turn, strengthen the Government's case.

Q. [by defense counsel]: Well, how did you think it would strengthen the Government's case? (Pause) Take your time, Mr. Heinritz.

A. By the mere fact that protection was afforded me.

Q. Because it would make Mr. Brown look like an evil man, right?

A. Mr. Brown is an evil man.

Trial Transcript at 222–23. Mrs. Heinritz's version of Mr. Heinritz's explanation to her of his reasons for entering the Witness Protection Program was somewhat closer to that suggested by defense counsel:

Q. [by defense counsel]: Did there come a time, forward of that separation where you learned that Mr. Heinritz was going in to the program called the Witness Protection Program?

A. [Mrs. Heinritz]: Yes.

Q. Did he discuss that with you?

A. Yes, he did.

Q. And what did he say about it and why he was going into it?

A. ... he said he didn't want to leave New Orleans–he is a native and he likes the City–and that he didn't want to leave New Orleans, but that he had to do it to make it look good, to make his story believable.

Trial Transcript at 272–73. In both cases, Mrs. Heinritz's statements impeach the truthfulness of Mr. Heinritz's testimony: the first relays an admission of perjury before the grand jury on an important part of his story, and the second relays an admission of a general desire to make his story look more believable than he apparently felt it was. Moreover, both statements directly contradicted Mr. Heinritz's version of the confidential communications between them.

Mrs. Heinritz's testimony was not the only course taken by Brown, however, to impeach the truthfulness of Mr. Heinritz's testimony. In fact, the record of Mr. Heinritz's cross–examination contains several instances in which Brown successfully demonstrated that Mr. Heinritz had made a false statement during the course of these criminal proceedings. First, Mr. Heinritz admitted that he had originally lied to an agent of the Federal Bureau of Investigation; according to Mr. Heinritz's testimony, he omitted the truth about the fraudulent premium financing application in order to give

Brown time "to get his affairs in order." Trial Transcript at 87, 98. Second, Mr. Heinritz admitted that he had lied under oath during a deposition taken in civil litigation arising out of the same fraudulent scheme; he again omitted the truth about the scheme (and lied in response to a number of specific questions), this time because Brown had told him to say only that the premium financing agency "knew they were financing the whole amount." Trial Transcript at 86–7, 160–62, 165, 181, 197, 205–06. Third, there were two important discrepancies between Mr. Heinritz's testimony at trial and his testimony before the grand jury. At trial, Mr. Heinritz testified that he had correctly informed the premium financing agency that the policy at issue was prepaid; before the grand jury he testified that he had not told the agency one way or the other. Trial Transcript at 134–37. Also at trial, Mr. Heinritz testified that he was positive that Brown had said "I won't kill you," or "I won't murder you," or words to the same effect, in connection with Brown's physical threat against Mr. Heinritz; before the grand jury, he made no reference to any such language when questioned about the threat. Trial Transcript at 146–47. In addition to these untruths and discrepancies, Brown elicited damaging admissions from Mr. Heinritz during the course of cross–examination: Mr. Heinritz admitted that he did nothing to protect himself from Brown and in fact retained his job with Brown's insurance agencies, despite Brown's threat against him. Trial Transcript at 92, 101–03.

## II. BROWN'S SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM

Brown argues that the district court violated his Sixth Amendment right to confront the witnesses against him when it upheld Mr. Heinritz's claim of marital privilege. Brown did of course have the opportunity to cross–examine Mr. Heinritz, and was allowed to inquire into the matters he later sought to raise during the course of Mrs. Heinritz's testimony. Brown asserts, however, that the Sixth Amendment guarantees him the right to introduce Mrs. Heinritz's testimony in order to impeach that testimony given by Mr. Heinritz on both direct and cross–examination. In particular, he argues that he could have cast doubt on the truthfulness of Mr. Heinritz's testimony by introducing the two statements that would have been made by Mrs. Heinritz: that Mr. Heinritz had told her he had lied to the grand jury about Brown's threat to him; and that he had told her he entered the Witness Protection Program in order to make his story more believable.

Brown relies on several cases in which the Sixth Amendment has been held to limit or invalidate a privilege or rule of evidence. *See United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973) (absent a claim of need to protect military, diplomatic, or sensitive national security secrets, the Sixth Amendment right to compulsory process and the Fifth Amendment right to due process of law require the Presidential privilege as to confidential communications to give way where the district court determines after *in camera* inspection that the material is relevant and admissible in a criminal trial); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (Sixth Amendment was violated by a state statute which made juvenile adjudications inadmissible, where defendant sought to introduce the adjudication to demonstrate bias and prejudice); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (Sixth Amendment was violated by a state statute which disqualified persons charged as principals, accomplices or accessories in the same crime from testifying in behalf of one another, while permitting such persons to testify in behalf of the prosecution); *Salazar v. State*, 559 P.2d 66 (Alaska 1976) (Sixth Amendment overrides the common law privilege for confidential marital communications where defendant seeks to introduce the testimony of the witness's wife to the effect that the witness had himself confessed to the crime). *See also Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (due process was denied where the defendant

was unable, because of the combined effect of state voucher and hearsay rules, to introduce evidence corroborating, or to cross–examine regarding, a confession to the same crime previously made by a witness he had called).

We agree that, in some cases, a privilege or rule of evidence must give way to the defendant's Sixth Amendment rights. But in order to establish a right to the introduction of Mrs. Heinritz's testimony, Brown would have to cross several hurdles. First, we recently decided that the Sixth Amendment does not guarantee the defendant a right to inquire on cross–examination into incidents which would impeach the witness's general propensity for truthfulness. *Cloud v. Thomas*, 627 F.2d 742, 744 (5th Cir. 1980). Although we left the door open for a Sixth Amendment claim of a right to inquire into instances which would (as here) impeach the truthfulness of the witness's testimony in the trial itself or cast doubt on the truthfulness of the witness's testimony with regard to particular facts alleged in the indictment, we did not specifically decide the question. 627 F.2d at 745. Second, assuming that the Sixth Amendment entitles Brown to inquire on cross–examination into Mr. Heinritz's confidential communications with his wife, it is by no means clear that the Sixth Amendment entitles him to introduce extrinsic evidence (such as the testimony of Mrs. Heinritz) to prove such communications in the event that he fails to establish them on cross–examination. The question does not seem to have been addressed. Third, assuming that Brown has a Sixth Amendment right to introduce Mrs. Heinritz's testimony, it is by no means clear that the appropriate resolution to a conflict between that right and the

marital privilege is the actual introduction of the testimony; arguably, a defendant may be entitled in such cases only to strike that portion of the testimony of the witnesses against him with regard to which his right of confrontation is lost.[2]

■ We need not, however, reach any of these questions. Our review of the record convinces us that Brown's inability to introduce Mrs. Heinritz's testimony did not in any substantial sense deprive him of the ability to test the truth of Mr. Heinritz's testimony. Absent a showing of such prejudice, the interests protected by the Sixth Amendment are not implicated.

In *Fountain v. United States*, 384 F.2d 624 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968), we analyzed the reach of the Sixth Amendment in a case where a witness had on cross–examination claimed the Fifth Amendment privilege against self–incrimination, thereby limiting the defendant's ability to challenge his testimony. We held that the defendant's Sixth Amendment right to confront the witnesses against him is not violated in all cases in which cross–examination is limited:

> The ultimate inquiry is whether the defendant has been deprived of his right to test the truth of the direct testimony. If he has, so much of the direct testimony as cannot be subjected to sufficient inquiry must be struck. The distinction is generally drawn between invoking the privilege as to "collateral matters," not requiring the striking of direct testimony, and invoking it as to "direct" matters. But the line between "direct" and "collateral" is not clear, and *the question in each*

---

2. The appropriate resolution of any conflict between the Sixth Amendment and an evidentiary privilege would of course depend on the particular privilege at stake and on the nature of the evidence excluded. It is clear, for example, that the Fifth Amendment privilege against self–incrimination may not be overridden by the Sixth Amendment right of confrontation. *E. g., United States v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974). Thus, if a witness validly claims the privilege against self–incrimination, the defendant's only relief is a motion

to strike that portion of the direct testimony with regard to which the confrontation right is lost. *E. g., Fountain v. United States*, 384 F.2d 624, 628 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968). The same is not necessarily true, however, in the context of other privileges; in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973), for example, the President was compelled to produce evidence despite the assertion of a legitimate privilege.

*case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony.*

384 F.2d at 628 (citations omitted) (emphasis added). The testimony at issue in *Fountain* was given by the government's chief witness, who testified to a series of narcotics transactions for which the defendants had provided protection in return for payments. On direct examination, the witness stated that he had withdrawn money from his wife's bank account in order to make the initial protection payment, and on cross–examination he admitted that he had travelled extensively in the United States after the arrest of the defendants. When asked about the source of the funds used in both of these instances, however, the witness asserted his privilege against self–incrimination. We upheld the exercise of the privilege and held that the testimony to the incidents raised on direct and cross–examination need not be stricken: the foreclosed inquiry was clearly "collateral" to the matters raised on direct examination, and therefore did not prejudice the defendant's ability to test the truth of the witness' testimony.

We recently applied the *Fountain* test in *United States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (multiple federal racketeering indictment). On cross–examination, one of the government's chief witnesses asserted his privilege against self–incrimination and refused to answer whether he had conferred with government agents "primarily because of his own personal activities in criminal affairs"; whether he had had a source of income other than employment or had filed a tax return; and whether he had ever testified falsely under oath. We found, however, that the defendants had had ample opportunity on cross–examination to challenge the witness's lack of credibility: the witness had admitted to having lied in the past, was thoroughly cross–examined on his cooperation with law enforcement agents, and testified on cross–examination

that at the time the police first approached him he was charged with armed robbery and at the time of trial was scheduled to be tried on a state arson charge. On this basis we concluded that "the responses elicited by defendants' questions would have been mere cumulative evidence of credibility." 603 F.2d at 552. Consequently the defendants' Sixth Amendment rights were not infringed.

Brown argues that, if Mrs. Heinritz's testimony had been introduced, the jury might have concluded that Mr. Heinritz had perjured himself during the trial. This was precisely the concern of the trial judge whose order granting in the alternative a new trial or acquittal was reversed in the first appeal of this case. As he explained the basis of his order:

> Defendant's conviction by a jury was based, at least in part, upon evidence which a jury might have found perjurous [sic] if the impeaching evidence, which very well could have been found to be highly credible, had been submitted to the jury. It was not, however, upon objection based upon marital privilege.

Order Granting Judgment of Acquittal, July 11, 1977. As *Fountain* makes clear, however, the Sixth Amendment is not implicated merely because the excluded evidence "very well could have been found to be highly credible" and the jury therefore "might have found [the testimony] perjurous." The test, rather, is whether the defendant's inability to make the inquiry (in this case, his inability to introduce Mrs. Heinritz's testimony) "created a substantial danger of prejudice by depriving [the defendant] of the ability to test the truth of the witness's direct testimony."

Whether the defendant's Sixth Amendment rights have been violated depends, therefore, not only on the use to which the excluded testimony could have been put, but also on the alternative means open to the defendant to impeach the credibility of the witness. Whether the exclusion of particular impeaching evidence creates a substantial danger of prejudice therefore depends, at least in part, on the defendant's

ability to make the same impeachment argument in the absence of the excluded evidence. Thus, in *Diecidue* we held that the Sixth Amendment was not implicated even though the excluded questions might have produced answers which directly impeached the truthfulness of the witness's testimony: in the context of the admissions which the witness in fact made on cross–examination, the additional questions would have been merely cumulative.

The record in this case leads us to the conclusion that Brown was not prejudiced within the meaning of *Fountain* and *Diecidue*. It is true that Mrs. Heinritz's testimony, if accepted by the jury as credible, would have implicated the truthfulness of Mr. Heinritz's testimony. And, as the trial court recognized, her testimony was, because of Mr. Heinritz's denials on cross–examination, the only direct evidence that Mr. Heinritz had lied during the course of his testimony at Brown's trial. But the defense elicited damaging admissions of untruthfulness during the course of its cross–examination of Mr. Heinritz: he admitted that he had lied to an officer of the F.B.I. during its original investigation of this case; he admitted that he had lied on several matters under oath during a deposition taken in civil litigation arising out of the same incidents; he was unable to reconcile important discrepancies between his testimony at trial and his testimony before the grand jury; and he admitted that he had done nothing to protect himself from Brown, despite his claim that he acted in the scheme only because of physical threats made by Brown. In the context of these admissions we cannot say that the absence of Mrs. Heinritz's testimony deprived Brown in any substantial way of his ability to test the truthfulness of Mr. Heinritz's testimony. We conclude, therefore, that the district court's decision to uphold Mr. Heinritz's claim of marital privilege did not infringe on Brown's Sixth Amendment right to confront the witnesses against him.

## III. BROWN'S FIFTH AMENDMENT RIGHT TO DUE PROCESS OF LAW

█ Brown argues that he was denied due process of law in two separate respects.

In the first place, he argues that, if Mrs. Heinritz's testimony is believed, his conviction was based on perjured testimony. To establish a violation of due process he relies on the district court's order alternatively granting a new trial or acquittal. Since the jury might have found Mr. Heinritz's testimony to be perjurious if Mrs. Heinritz's testimony had been introduced, the judge concluded that fundamental notions of due process and the right to a fair trial were at stake:

> It offends this Court's sense of justice to enter a judgment of conviction based upon evidence which may very well be found to be perjurious.

Order Granting Judgment of Acquittal, July 11, 1977. We agree that it is indeed possible that the jury might have believed Mrs. Heinritz and concluded that Mr. Heinritz's testimony was at least in part untrue. But, as we have already stated, Brown had ample opportunity to challenge the truthfulness of Mr. Heinritz's testimony. We do not believe that Brown's argument is strengthened when put in terms of the Due Process Clause of the Fifth Amendment instead of the Confrontation Clause of the Sixth Amendment. Since it is evident that the exclusion of Mrs. Heinritz's testimony created no "substantial danger of prejudice by depriving [Brown] of the ability to test the truth of the witness's direct testimony," we do not believe that Brown's right to due process of law was infringed.

In the second place, Brown argues that he was denied due process of law because of the prosecutor's failure to notify him, in advance of Brown's cross–examination of Mr. Heinritz, that Mr. Heinritz would claim the marital privilege when the defense attempted to introduce Mrs. Heinritz's testimony. Brown does not argue that the prosecutor generally has a duty to notify the defendant when he expects a government witness to invoke a privilege. Instead, he asserts that a duty arose because of the prosecution's apparent involvement in encouraging and asserting the privilege. As we noted in the first appeal of this case, it

appears that Mr. Heinritz asserted the privilege only after having been prompted to do so by the prosecutor. *United States v. Brown, supra*, at 188. As the record reveals, it was the prosecutor (not Mr. Heinritz's attorney) who approached the bench to assert the privilege as Mrs. Heinritz took the stand. Trial Transcript at 261.

Although Brown cites no authority for the proposition that the government's participation in the assertion of a witness's evidentiary privilege obligates it to notify the defense in advance of the assertion, we believe that in some instances such an obligation may exist. As we explained in *United States v. Anderson*, 574 F.2d 1347 (5th Cir. 1978):

> The long–settled rule has been that the knowing use by the prosecution of false evidence or perjured testimony which is material to the the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. *The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows it to be presented with a materially false impression.* The same result may obtain even though the false nature of the evidence concerns only the credibility of an important witness, rather than the ultimate issue of guilt or innocence.

574 F.2d at 1347 (citations and footnotes omitted) (emphasis added). *See Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *United States v. Barham*, 595 F.2d 231 (5th Cir. 1979). Where the prosecutor knows that false or perjured testimony will be elicited on cross–examination of a government witness, and also knows that the assertion of a privilege during the defendant's case will prevent the defense from challenging the testimony, his failure to notify the defendant of the anticipated claim of privilege in advance of the defendant's attempt to elicit the false or perjured responses may constitute passive but knowing action which allows false or perjured testimony "to be presented with a materially false impression." If so, the government will be treated as if it introduced the false or perjured testimony itself, and the defendant's right to due process of law will likely be implicated. In this context, Brown's argument is that the government knew that Mr. Heinritz would lie on cross–examination as to the content of confidential marital communications between himself and Mrs. Heinritz, and also knew that Mrs. Heinritz would be prevented, by the assertion of a marital privilege, from testifying to contradict Mr. Heinritz. The government's failure to notify Brown of the anticipated claim of privilege resulted, so the argument runs, in the jury being left with only one side–the perjured side–of the story.

We do not believe, however, that Brown's due process rights are implicated on the facts of this case. In the first place, Brown does not assert (and the record does not indicate) that the prosecutor knew or believed Mr. Heinritz's testimony to be actually untrue; at most, the prosecutor knew that Mrs. Heinritz would contradict Mr. Heinritz's version of the confidential communications between them. Due process does not obligate the prosecution to take affirmative action to dispel every possible misimpression created by a claim of privilege which prevents the introduction of testimony contrary to that given by a government witness. As we have stated before, due process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements. *See Mayola v. State of Alabama*, 623 F.2d 992, 1001 n. 9 (5th Cir. 1980); *United States v. Holladay*, 566 F.2d 1018 (5th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). In the second place, the government does not appear to have been aware that Mr. Heinritz would assert his marital privilege, or that it would

later encourage such an assertion, at the time of Brown's cross–examination of Mr. Heinritz. In fact, Brown's counsel did not notify the government that he would call Mrs. Heinritz to testify until forced to do so by the government's objection to his inquiry into Mr. Heinritz's participation in the Witness Protection Program. In order to demonstrate the relevance of that line of questioning, Brown's counsel apparently explained during a bench conference that he would call Mrs. Heinritz during his case. He then immediately proceeded to inquire into Mr. Heinritz's participation in the Witness Protection Program; there was no recess in which the government might have considered encouraging Mr. Heinritz to claim the privilege and, since Mr. Heinritz was on the stand, he obviously could not have informed the government of his own intentions. Trial Transcript at 217. Moreover, the more damaging line of inquiry–in which Mr. Heinritz denied ever having said to his wife that he had lied to the grand jury–took place sometime *before* the bench conference at which Brown's counsel announced that he would call Mrs. Heinritz. Trial Transcript at 144–45. It seems clear, therefore, that the government did not know that Mr. Heinritz would assert his marital privilege until Mr. Heinritz's allegedly perjurious denials had already been elicited on cross–examination. Since the prosecutor did not know or believe either that Mr. Heinritz would perjure himself on cross–examination, or that Mr. Heinritz would later claim the marital privilege, Brown's due process rights were not infringed by the government's failure to notify him in advance of Mr. Heinritz's assertion of the privilege.

■ Brown also argues, however, that the government should have raised Mr. Heinritz's marital objection before Mrs. Heinritz took the stand, that is, before the jury entered the courtroom to hear Brown begin his case. Brown argues that his case was prejudiced by the impression which may have been left on the jury by his inability to produce his first witness and by the instruction given by the court to explain that inability. When the jury returned after the

court's decision to uphold the marital privilege, the court explained that Mrs. Heinritz would be excused as a witness because it appeared that the testimony she was about to give would not be legally admissible. Trial Transcript at 300. As Brown argues:

> During this lengthy hiatus [while the attorneys argued the applicability of the privilege], the jurors may have drawn any number of inferences as to Mrs. Heinritz's demeanor and speculations as to why defense counsel called her as a witness and her subsequent failure to testify.

Appellant's Brief at 32. Brown does not suggest what particular unfavorable inference might have been drawn by the jury, and we suspect that a favorable inference (*i. e.,* that Mr. Heinritz had claimed a marital privilege to keep his wife from testifying) is at least as likely. The mere act of calling a witness whose testimony turns out to be legally inadmissible does not–taken alone–create a "materially false impression" with respect to any evidence (false or otherwise) introduced during the trial. We conclude, therefore, that Brown's right to due process of law was not infringed by the government's failure to assert the privilege before Mrs. Heinritz actually took the stand.

## IV. WAIVER OF THE CONFIDENTIAL MARITAL COMMUNICATIONS PRIVILEGE

■ Mr. Heinritz arguably waived his confidential marital communications privilege on two separate occasions. First, he allowed his wife to testify to the privileged communications as an offer of proof. It is true, as the government argues, that the court was informed that Mr. Heinritz wished to claim the privilege at the moment Mrs. Heinritz took the stand, and that Mr. Heinritz thereafter allowed his wife to testify as an offer of proof only because the judge explained that to be the proper procedure. Trial Transcript at 261–66. An important distinction can be made, however, between a privilege which protects against the *introduction into evidence* of certain testimony (such as the adverse spousal testi-

mony privilege) and a privilege which protects only against the *disclosure* of certain communications (such as the confidential marital communications privilege at issue here). One can argue that the privileged party's consent to disclosure *for any purpose* waives the confidential communications privilege, for once the communication has been disclosed to any third party with the consent of the privileged party, the communication may no longer be "confidential" within the meaning of the privilege. *See United States v. Lilley*, 581 F.2d 182, 189 (8th Cir. 1978); *Fraser v. United States*, 145 F.2d 139, 144–45 (6th Cir. 1944), *cert. denied*, 324 U.S. 849, 65 S.Ct. 684, 89 L.Ed. 1409 (1945).

In the second place, Mr. Heinritz testified on cross–examination to the content of the confidential marital communications he later sought to prevent his wife from disclosing. As Wigmore states, the confidential marital communications privilege may be waived by "some act of testimony which in fairness places the person in a position not to object to further disclosure." 8 J. Wigmore, *Evidence* § 2340 at 671 (1961). Mr. Heinritz admitted on cross–examination that he had discussed with his wife both his testimony before the grand jury and his reasons for entering the Witness Protection Program; he specifically denied, however, both that he had told his wife he had lied to the grand jury and that he had told his wife he had entered the Witness Protection Program in order to make his story more believable. Trial Transcript at 145, 221–22. Mr. Heinritz's answers on cross–examination at least arguably waived his privilege with respect to the particular communications he was willing to discuss on cross–examination, which included the two statements to which Mrs. Heinritz was willing to testify. The confidential marital communications privilege was not intended to allow one spouse to provide his or her own version of a particular communication while preventing the other version from being disclosed. *See United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir. 1974) *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975); *United States v. Benford*, 457

F.Supp. 589, 596–98 (E.D.Mich.1978); 81 Am.Jur.2d § 171 (1976).

However, neither of these waiver theories was urged in the district court. Brown's counsel raised a number of arguments in challenge to Mr. Heinritz's assertion of the marital privilege, but these were not among them. Trial Transcript at 261–66, 288–301. The first of these arguments is raised for the first time on appeal; the second has not been raised by any party at any time. Therefore we can consider these two theories of waiver only if we find that the court's upholding of Mr. Heinritz's claim of marital privilege was "plain error" within the meaning of Fed.R.Crim.P. 52(b). As we have stated before, plain error can be said to exist only where "the error is so obvious that failure to notice it would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.' " *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir. 1971). *See* 3 C. Wright & A. Miller, *Federal Practice & Procedure* § 856 (1969).

We do not believe that the court's action can be characterized as plain error. In the first place, the sole waiver argument raised on appeal is hardly an "obvious" one; while a communications privilege may arguably be waived by any form of consented disclosure, a serious question is raised where, as here, the trial judge himself instructs the disclosure. In the second place, the allowance of the marital privilege cannot be said to have seriously affected the fairness of the proceeding. This follows from our decision in *Fountain v. United States, supra*. In *Fountain*, two separate lines of inquiry on cross–examination had been excluded by the judge because of the witness's privilege against self–incrimination. Fountain argued on appeal that both lines of inquiry would have led to admissions which would have impeached the truthfulness of the witness's direct testimony; in the second instance, however, Fountain's counsel had not explained the purpose of the questions to the trial judge and had made no motion to strike the witness's direct testimony. We concluded that appeal on the basis of the second excluded line of inquiry was foreclosed by the plain error doctrine:

Since the district court was neither apprised of the purpose of the inquiry nor asked to rule on the matter or to strike the direct testimony, the situation cannot require reversal unless it amounts to "plain error" within the meaning of Fed. R.Crim.P. 52(b).... In this case inability to inquire [into the excluded subject] did not deprive appellants of the right to test the truthfulness of [the witness's] testimony in any substantial way.

384 F.2d at 628–29 (citations omitted). The issue before us now is analogous to that decided in *Fountain* : Brown was precluded from introducing evidence that would have challenged the truthfulness of the testimony of the State's chief witness. But as we have already decided, in Part II, *supra*, the exclusion of Mrs. Heinritz's testimony did not substantially prejudice Brown by depriving him of the ability to test the truth of Mr. Heinritz's testimony. We conclude that whatever error may arguably have been committed by the trial court's allowance of Mr. Heinritz's claim of privilege was not plain error. Therefore we decline to address the merits of either waiver argument.

## V. CONCLUSION

The district court did not violate either Brown's Sixth Amendment right to confront the witnesses against him or his Fifth Amendment right to due process of law when it upheld Mr. Heinritz's claim of marital privilege as a bar to the introduction of Mrs. Heinritz's testimony. Brown's arguable challenges on the basis of waiver were not raised in the district court; they are not properly before us because the ruling of the district court was, if error at all, certainly not plain error. Brown's conviction and sentence are therefore affirmed.

AFFIRMED.

LYNNE, District Judge, concurs in the result only.