**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Javier MARTINEZ–MERCADO,
Defendant–Appellant.**

No. 89–1343
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1989.

Eduardo N. Lerma, El Paso, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Philip Police, Asst. U.S. Attys., Helen M. Eversberg, San Antonio, Tex., for plaintiff-appellee.

Before POLITZ, GARWOOD, and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge.

A jury found Appellant Javier Martinez–Mercado (Martinez) guilty of importing marihuana into the United States, in violation of 21 U.S.C. § 952(a), and of possessing marihuana with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Martinez appeals on several grounds, maintaining that the prosecution improperly failed to disclose certain evidence to him before trial; that the trial judge incorrectly denied his motion for acquittal; that the prosecutor violated his due process rights by eliciting from witnesses information that was probably false and by commenting on his silence during interrogation; and that the prosecution violated the Speedy Trial Act, 18 U.S.C. § 3161, *et. seq.* We affirm.

## Facts and Proceedings Below

At 4:45 a.m. on October 31, 1988, Martinez drove a Dina truck tractor across the bridge from Juarez, Mexico to El Paso, Texas. United States Customs Service Inspector Jose Trejo (Trejo) testified that agents ordered Martinez to drive into the secondary inspection area because the Dina, which had exceptionally long fuel tanks supported by three straps rather than the usual two, resembled a truck that had passed their outpost two days earlier, but which they had failed to inspect. At the secondary inspection area, Trejo asked Martinez for a declaration of what he was bringing from Mexico, to which Martinez replied "nothing." He also requested identification from Martinez, who presented Trejo with a United States border crossing card that allowed him to enter the country and travel up to twenty-five miles from the border.

Trejo testified that he then examined the truck's tanks to determine if they actually contained fuel. By tapping both with a brass hammer, he sensed that a portion of each tank held something solid. Trejo also noticed that the original fuel outlets had apparently been welded closed and the nozzles had been moved to the very end of the tanks.

At that time, agents decided to escort Martinez to their office at the bridge. Trejo testified that when they approached him, Martinez asked what was happening and volunteered that he was unemployed and seeking a job, even though his border entry card prohibited him from seeking employment in this country. Martinez also asserted that "they" had loaned him the truck, but was unable to identify who "they" were.

While agents detained Martinez, Trejo searched the interior of the truck. He noticed that the cab was very clean, which seemed unusual to him because such trucks frequently gathered dust on the Mexican roads. Trejo also observed that the cab did not contain personal effects, such as a toiletry kit, food, or a change of clothing, items truck drivers ordinarily carried when crossing the border because of the usual delays in clearing customs.

As a result of their suspicions, the agents called for the Customs Service canine unit to inspect the truck. The dog alerted to the gas tanks, which were then removed and found to be tightly packed at one end with bales of marihuana. The Drug Enforcement Agency (DEA) later determined that the total weight of marihua-

na was 306 pounds with a street value in El Paso of $240,000.

At this point, Trejo and fellow United States Customs Service Inspector Rodolfo Reyna (Reyna) arrested Martinez, advised him of his *Miranda* rights, and searched him, finding $132. Reyna asked Martinez whether he owned the truck and Martinez responded negatively. He further denied knowing the identity of the owner and maintained that he did not recognize the names on various United States and Mexican vehicle registration and taxation forms found in the cab, all of which contained some variation of the name "Martinez."[1]

DEA Special Agent Felipe Garcia (Garcia) testified that he was called to the scene at 9:30 that morning to inspect the contraband and interrogate the suspect. After advising Martinez of his *Miranda* rights in Spanish, Garcia asked him to explain his situation. Martinez asserted that earlier that morning, a man had approached him in a Juarez motel and offered him $300 to drive the truck to El Paso to pick up a semitrailer. However, Martinez was un-

able to tell Garcia where he was to obtain the semitrailer or how long his journey was to last. When Garcia inquired about the identity of his employer, Martinez then terminated the questioning. Both Trejo and Reyna testified that in their experience drivers working along the border typically earned only between $400 to $600 per month.

Following the conviction of Martinez on both counts, the district court sentenced him to sixty-three months in prison on each count to be served concurrently and four years of supervisory release on each count to be served concurrently as well. This appeal followed.

## Discussion

■ Martinez raises several points on appeal, which we discuss in turn. First he contends that the prosecution deprived him of a fundamentally fair trial by failing to disclose prior to trial several matters about which Trejo and Reyna would eventually testify on the witness stand.[2] During dis-

---

1. Two Mexican documents contained the name "Martinez Narvaez Enrique" and one carried the name "Martinez V. Enrique." The United States Customs Service vehicle user fee document contained the name "Enrique Martinez Nevarez."

2. The items of Trejo's testimony about which this complaint is made are the following:
 "A. ... And the reason we had our attention to it was because two days earlier a vehicle resembling that—
 "....
 "A. It came into the port of entry with extra long tanks. But before we stopped it, it went down the road. So we kept a watch out for another vehicle with long tanks....
 "And as it approached, everybody saw the truck and ran up and directed the truck into secondary inspection.
 "....
 "A. ... I ran out in the street and directed the traffic to pull into the secondary inspection area.
 "....
 "A. The original nozzle looked like it had been moved. It was welded over. You could see the weld marks. And it moved over closer to the edge of the tank so the gasoline could go straight down the tank.
 "....
 "A. ... Usually you have two straps on the thing, and he had three straps.... We had never seen a trailer with a tank that long....
 "...."

 "A. ... [W]e searched the truck inside and out, and it was pretty clean. It didn't have the normal stuff that a truck driver has like clothes if he's going on a trip or lunch if he's going to work here. It even looked like it had been vacuumed.
 "A. [This aroused my suspicion] because of the trucks you see in Mexico, they travel over dusty roads. I don't think I ever seen a vacuumed truck before. So we thumped on the gas tank some more. We said, 'There's got to be something there.'... The agents came down and authorized us to call the mechanics from the Union 76 station to take the tanks down. We kept the truck there until the mechanics came down there.
 "....
 "A. Well, if he was looking for a job, he had to have some kind of lunch, or if he was working, he had to have some kind of a lunch.
 "....
 "A. Most of the time they have a little bag with a toothbrush or shaving equipment or have an extra shirt, extra pants if they're working here because they can never tell how long they're going to stay in line for the import lot to clear a shipment. So they all carry something to tide them over until they go back to Mexico.
 "....
 "A. ... I didn't see any [log books]. And I searched the truck all over.

covery, the prosecution provided Martinez with copies of several government reports and agents' statements about the case. Martinez maintains that the agents' testimony "creat[ed] a totally different scenario" from that depicted by the documents provided to him by the prosecution. He appears to assert that the prosecution thereby misrepresented its case during the discovery process and thus violated the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the district court's discovery order, which was modeled after Fed.R.Crim.P. 16.

The Supreme Court has declared that a "general constitutional right to discovery in a criminal case" does not exist. *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987) (quoting *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977)); *see also United States v. Fischel,* 686 F.2d 1082, 1091 (5th Cir.1982). The Court, however, has recognized that a defendant's due process right to a fair trial prohibits the prosecution from suppressing evidence that is favorable to the accused and "material either to guilt or to punishment." *Brady,* 83 S.Ct. at 1196–97. Evidence that impeaches the credibility of a government witness whose testimony " 'may well be determinative of [the defendant's] guilt or innocence' " is *Brady* material that the prosecution may not suppress. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (quoting *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). Evidence that would exculpate the accused is such material as well. *United States v. Johnson,* 872 F.2d 612, 619 (5th Cir.1989). Nevertheless, because *Brady* and its progeny only serve to restrict the prosecution's ability to suppress evidence rather than to provide the accused a right to criminal discovery, the Supreme Court has asserted that the *Brady* rule was never intended "to displace the adversary system as the primary means by which truth is uncovered...." *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). *See also Weatherford,* 97 S.Ct. at 846. As the evidence in question here was presented at trial, it was not suppressed, regardless of whether or not it had previously been disclosed during discovery. The substance of Martinez's complaint is not that evidence *was* suppressed, but rather that it *should have been* (but was not) suppressed because it was not disclosed in discovery pri-

---

" ....

"Q. Okay, could you tell the jury approximately how far one could go if one was on a normal business trip with a tractor of this nature, how far would you be able to drive?

"A. About 70 miles, 80 at the most and then it would run out of gas.

" ....

"A. When we got a closer look when the mechanics got there, some of the bolts holding the straps down were kind of loose. And when they took the straps off, there was bondo on one end of the tank where it looked like—well, they painted over the bondo and made it look like part of the tank. And they dropped the tank. The first tank was kind of difficult to get off because we didn't know how it was put in, how the lid was put on there. So we hammered with a sledgehammer and screwdriver, whatever we had there and it finally came off. And there was a lid with a whole bunch of screws all the way around.

" ....

"A. ... After we realized how the cannister was put together, then all we did was go to the other side and find four screws, unscrew that and the lid just came right off.

" ....

"A. [H]e had $132 in his pocket plus some Mexican currency which we normally don't count because it didn't amount to that much.

" ....

"A. Well, being unemployed, having $132, no, there's no law against it, but for being unemployed and looking for a job, I thought that was quite a bit of money in his pocket."

The items of Reyna's testimony complained of in this respect are the following:

"A. It was a green vehicle, tractor, very nicely—it was a bright green, a canvas stake about it, nice chrome wheels on it. Our supervisor had alerted us to the vehicle, the type of vehicle and the type of tank that could possible have some kind of contraband in it. As I was working on Lane 4, I yelled, 'I think that's our truck coming up.' The inspectors dashed across the street there, or the lane and intercepted the truck.

" ....

"A. ... I didn't inspect the inside of the vehicle. That part had already been inspected by the other inspector."

or to trial. This does not state a *Brady* violation claim.

Moreover, there was no *Brady* violation for the additional reason that the allegedly suppressed material was not exculpatory and could not have served to impeach the prosecution's witnesses. The information that Martinez contends is *Brady* material consisted of what Trejo and Reyna said in their testimony about their observations and impressions of their encounter with Martinez and the truck he was driving on October 31. This testimony in no way tended to exculpate Martinez. As Martinez asserted in his brief, "[h]ad it not been for those items the Government would not have had sufficient factual basis to support" the inferences of knowledge and intent necessary for a conviction. Additionally, this testimony *itself* did not help to impeach the credibility of the prosecution's witnesses; rather, the omission from the agents' investigative reports of these matters related in their testimony tended to serve the impeachment function by revealing the agents' inattention to detail, which is just the use that Martinez's attorney made of these omissions at trial. Because

the information omitted from the reports was not favorable to Martinez, it could not have been *Brady* material. And, the fact that the reports did not contain the information testified to was *not* suppressed, but rather was entirely disclosed at trial and there fully exploited for all its possible impeachment value by Martinez.

As this Court has observed, *Brady* does not impose a duty on the prosecutor "to make a complete and detailed accounting of all police investigatory work on a case—to routinely deliver his entire file—to defense counsel." *United States v. Brown,* 628 F.2d 471, 473 (5th Cir.1980).

■ Martinez also maintains that the omission of the facts to which Trejo and Reyna would testify at trial from the investigative reports and statements provided to him by the prosecution contravened the district court's standing discovery order. That order essentially mirrored Fed.R. Crim.P. 16, which requires the prosecution to allow the accused to copy, upon request, certain information in the possession of the prosecution.[3] None of the evidence at is-

3. Rule 16(a) reads as follows:

"(1) Information Subject to Disclosure.

"(A) Statement of Defendant. Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged. Where the defendant is a corporation, partnership, association or labor union, the court may grant the defendant, upon its motion, discovery of relevant recorded testimony of any witness before a grand jury who (1) was, at the time of that testimony, so situated as an officer or employee as to have been able legally to bind the defendant in respect to conduct constituting the offense, or (2) was, at the time of the offense, personally involved in the alleged conduct constituting the offense and so situated as an officer or

employee as to have been able legally to bind the defendant in respect to that alleged conduct in which the witness was involved.

"(B) Defendant's Prior Record. Upon request of the defendant, the government shall furnish to the defendant such copy of the defendant's prior criminal record, if any, as is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government.

"(C) Documents and Tangible Objects. Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

"(D) Reports of Examinations and Tests. Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control

sue in this respect was subject to discovery under Rule 16(a)(1)(A–D) because it consisted only of testimony of the agents' own observations and impressions of events on October 31 and not of statements by Martinez, his arrest record, tangible objects, or test or experiment results.

Rule 16(a)(2) demands that the prosecution permit discovery as compelled by the Jencks Act, 18 U.S.C. § 3500. The Jencks Act requires the prosecution to produce, upon request after direct examination, "any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Section 3500(e) defines a statement as:

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

"(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

The Jencks Act's objective is to guarantee that defendants are furnished with statements of witnesses for impeachment use on cross-examination, but not to make such statements available during discovery. 2 W. LaFave & J. Israel, *Criminal Procedure* § 19.3(g) (1984).

 This Court has determined that an investigative report may well be considered a Jencks Act statement of its author so long as the report satisfies section 3500(e) and pertains to the subject matter of the agent's testimony. *United States v. Welch*, 810 F.2d 485, 490 (5th Cir.1987). *See generally United States v. Newman*, 849 F.2d 156, 159–60 (5th Cir.1988). However, we have never required the prosecution "'to develop potential Jencks Act statements'" by demanding that its witnesses reduce to writing every matter about which they intend to testify at trial. *United States v. Rodarte*, 596 F.2d 141, 145–46 (5th Cir.1979) (quoting *United States v. Cruz*, 478 F.2d 408, 411 (5th Cir.), *cert. denied sub nom. Aleman et al. v. United States*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973)). Consequently, the Jencks Act imposed no obligation on the prosecution to reveal to Martinez any more than what was actually embodied in the reports and written statements provided to him.[4] Thus, the prosecution did not violate Rule 16 or the district court's discovery order.

Martinez's next complaint on appeal is that the district court incorrectly denied his motion for judgment of acquittal because it considered the testimony of the agents not disclosed to him prior to trial. Essentially, Martinez contends that, without such testimony, the evidence was insufficient to sustain his conviction.

Because of our ruling, *supra*, that nondisclosure of such testimony to Martinez prior to trial did not violate his rights, we conclude that this evidence may properly

---

of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

"(2) Information Not Subject to Disclosure. Except as provided in paragraphs (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective

government witnesses except as provided in 18 U.S.C. § 3500.

"(3) Grand Jury Transcripts. Except as provided in Rules 6, 12(i) and 26.2, and subdivision (a)(1)(A) of this rule, these rules do not relate to discovery or inspection of recorded proceedings of a grand jury."

**4.** The prosecution actually exceeded its Jencks Act obligation by providing these documents to Martinez before trial, rather than simply waiting for him to request them after direct examination. We also note that Martinez enjoyed the full benefit of the Jencks Act by using the incomplete reports and statements to attempt to impeach the prosecution's witnesses. 2 W. LaFave & J. Israel, *supra,* § 19.3(g).

be considered in determining whether the evidence as a whole was sufficient.

■ Conviction of possession of marihuana with the intent to distribute it requires proof that the defendant had (1) knowing (2) possession of the illicit substance (3) with intent to distribute it. *See United States v. Richardson*, 848 F.2d 509, 511 (5th Cir.1988); *United States v. Williams–Hendricks*, 805 F.2d 496, 500 (5th Cir.1986). Regarding the additional charge of importation, the prosecution need only prove that Martinez played a role in bringing the marihuana into the United States from a foreign country. *See United States v. Hernandez–Palacios*, 838 F.2d 1346, 1349 (5th Cir.1988). The evidence is sufficient if any rational trier of fact could have found the essential elements of each offense beyond a reasonable doubt. *United States v. Palella*, 846 F.2d 977, 981 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). In evaluating Martinez's challenge, we examine the evidence as a whole in the light most favorable to the verdict and afford the prosecution the benefit of all reasonable inferences and credibility choices drawn therefrom. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Kim*, 884 F.2d 189, 192 (5th Cir.1989).

■ The jury could have reasonably determined that Martinez had possession of the marihuana because of his dominion and control over the Dina truck in which it was concealed. *United States v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir.1988); *United States v. Kaufman*, 858 F.2d 994, 1000 (5th Cir.1988). Likewise, the jury could have inferred Martinez's intent to distribute by virtue of the large quantity of marihuana found in his possession, 306 pounds. *United States v. Prieto–Tejas*, 779 F.2d 1098, 1101 (5th Cir.1986).

■ Knowing possession can be inferred from the defendant's control over the vehicle in which the illicit substance is contained, generally along with other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge. *Olivier–Becerril*, 861 F.2d at 426–27;

*United States v. Richardson*, 848 F.2d 509, 513 (5th Cir.1988); *United States v. Del Aguila–Reyes*, 722 F.2d 155, 157–58 (5th Cir.1983). In this case, other suspicious circumstantial evidence demonstrates guilty knowledge on the part of Martinez.

Martinez's explanation for the motivation behind his travel to the United States changed over the course of his detention at the border on October 31, 1988. Martinez's initial story was that an unidentified "they" had loaned him the truck to cross the border to look for work, even though he had no work permit. Later that day in response to a question from Garcia, Martinez asserted that "they" had paid him $300 to drive the truck to the United States to retrieve a semitrailer. Such inconsistency in explanations certainly allows for an inference of Martinez's guilty knowledge. *See, e.g., Richardson*, 848 F.2d at 513. In addition, Martinez's inability to identify who provided him with the truck as well as his claim to having been paid $300, a sum which agents testified was inordinately high for a journey of that kind if it were innocent, are examples of circumstantial evidence that is unquestionably suspicious in nature. *Cf. Del Aguila–Reyes*, 722 F.2d at 157–58 (the jury could infer that the defendant "should have known that his trip ... was prompted for some additional, probably illegal, reason" or was deliberately ignorant). Considered with Martinez's control over the drug-laden truck of which he was the driver and sole occupant, and the fact that the unusual nature of the fuel tanks and their special fittings were observable on exterior inspection, this circumstantial evidence is considerably more than sufficient to permit a jury to determine beyond a reasonable doubt that Martinez had knowledge of the marihuana in his possession. *See Olivier–Becerril*, 861 F.2d at 427.

■ Sufficient evidence of Martinez's role in importing the marihuana exists by virtue of his crossing the international frontier with a quantity of the illicit substance sufficient for a jury to infer intent to distribute. *Hernandez–Palacios*, 838 F.2d at 1349. As a result, the district court

was correct in ruling against Martinez on his motion for judgment of acquittal.[5]

■ Martinez's third contention on appeal is that the prosecution violated his due process rights by eliciting testimony that was, according to Martinez, probably perjured, and by commenting on his silence during interrogation. Regarding the first assertion of prosecutorial misconduct, in order to state a due process violation, Martinez must show that the prosecution knowingly presented materially false evidence to the jury. *United States v. Miranne*, 688 F.2d 980, 989 (5th Cir.1982), *cert. denied*, 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983); *United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981). Martinez has wholly failed to demonstrate, and even to allege, that the prosecution's witnesses, in fact, perjured themselves. Instead, he maintains that the witness's testimony "may well have been false." The omission of certain facts from the reports and written statements of the prosecution's witnesses, alone, is certainly not adequate to put the prosecution on notice of perjury on their part, much less to establish that such perjury in fact occurred. *See generally United States v. Viera*, 819 F.2d 498, 502 (5th Cir.1987); *Brown*, 634 F.2d at 827. If anything, the omissions merely go to the credibility of the witnesses, an area within the province of the jury (and fully disclosed to it here). *See Miranne*, 688 F.2d at 989; *see also Viera*, 819 F.2d at 502. In essence, Martinez's complaint amounts to nothing more than a disagreement with the verdict. That will not do. As we have held, the evidence is clearly sufficient to sustain the verdict.

■ Martinez's claims about prosecution comment on his silence during interrogation are wholly lacking in specificity. All Martinez says in this connection is that "the prosecutor used Defendant's exercise of his right to remain silent by pounding

into the jury's mind the inference that the Defendant very well knew who the owner of the truck was, particularly since the last name of the owner and Defendant was the same," that "the prosecutor used Defendant's silence during the time of interrogation to assure that he would obtain a conviction," and, at least inferentially, that this violated the rule of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[6] The prosecutor's allegedly offending language is not quoted or paraphrased; it is not stated at what stage of the trial this occurred; and, contrary to our local Rule 28.2.3, no record citations are furnished. Arguably, these assertions furnish nothing for review, as it is not the function of the Court of Appeals to comb the record for possible error, but rather it is counsel's responsibility to point out distinctly and specifically the precise matters complained of, with appropriate citations to the page or pages in the record where the matters appear.

Nevertheless, we have reviewed the record with Martinez's contentions in this respect in mind and, though we note one brief passing reference in both the prosecutor's opening statement and in his closing argument, and one question by the prosecutor of Agent Garcia, that arguably were improper under *Doyle* (a matter which we do not determine), no objection whatever was ever made to any of these matters (and no *Doyle*-type complaint was ever raised below). Consequently, reversal is proper only if the "plain error" standard is met. *See United States v. Morales*, 854 F.2d 61, 63 (5th Cir.1988) (applying "plain error" rule in declining to reverse for unobjected-to alleged *Doyle* violation); *United States v. Alvarado*, 806 F.2d 566, 573 (5th Cir.1986) (same). " 'Plain error may be recognized "only if the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in

---

5. Indeed, Martinez at least inferentially admits that the evidence was sufficient if it properly included the testimony which he claims should have been suppressed because it was not disclosed to him prior to trial.

6. In the statement of one of his issues on appeal Martinez also includes the assertion that "[t]he prosecutor further made reference to Defendant's silence as an indication of guilt." Nothing in this connection is mentioned in Martinez's two-page "Summary of Argument."

a miscarriage of justice."'" *United States v. Canales,* 744 F.2d 413, 431 (5th Cir.1984). As we have also stated, "[t]o constitute plain error, the error must have been so fundamental as to have resulted in a miscarriage of justice." *United States v. Yamin,* 868 F.2d 130, 132 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989). *See also Alvarado,* 806 F.2d at 573 (to be plain error, the error must be "'so great as to result in the likelihood of a grave miscarriage of justice.'"). No aspect of the plain error standard is met here, and there is clearly nothing to suggest a likely miscarriage of justice. The referenced possible *Doyle* violations did not loom large at trial. The prosecution's evidence of guilt was well more than sufficient, and there was essentially no contrary evidence. Accordingly, Martinez's *Doyle* contentions present no reversible error.

■ Martinez's final contention on appeal is that the prosecution violated the terms of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.,* and that his indictment should therefore have been dismissed. Section 3161(c)(1) provides that trial shall begin within seventy days of the later of the defendant's first appearance at court or the filing and making public of the indictment or information. Martinez's trial began on February 23, 1989, ninety-nine days after his November 16, 1988 indictment, the later of the two statutory dates. However, section 3161(h)(1)(F) allows an exception to the time limitation for delay caused by the filing and the court's consideration of pretrial motions.

Martinez filed several pretrial motions, including a December 23, 1988 motion to dismiss the indictment that the district court denied twenty-seven days later, as well as a February 9, 1989 motion that the court denied after fourteen days of consideration on February 23. He contends that the prosecution's unreasonable delay in responding to his December motion contributed to the delay in the court's ruling on it and that such delay is therefore not excludable under section 3161(h)(1)(F) in determining whether the Act's time limitation was satisfied. He asserts that, as a result, the fifteen days between January 3, 1989, the date on which the prosecution was to have filed a response under the local rules, and January 18, 1989, the date on which it actually responded to the motion, should not be included in the forty-one days excludable under section 3161(h)(1)(F). If the fifteen days are not excluded under that section, then seventy-three days of nonexcludable time passed between Martinez's indictment and the commencement of his trial, thus contravening the Act.

In *Henderson v. United States,* 476 U.S. 321, 106 S.Ct. 1871, 1876, 90 L.Ed.2d 299 (1986), the Supreme Court ruled that exclusions under section 3161(h)(1)(F) are not limited to only "'reasonably necessary' delays ... between the time of filing of a motion and the conclusion of the hearing thereon." *Id.* As a result of this decision, all forty-one of the days devoted to pretrial motions must be excluded under section 3161(h)(1)(F) and Martinez's final argument must fall.

### Conclusion

For the foregoing reasons, the conviction is

AFFIRMED.