**UNITED STATES, Appellee,**

v.

**Staff Sergeant Joseph L. MARTEL, 003–32–7640, United States Army,**
**Appellant.**

**CM 444895.**

U.S. Army Court of Military Review.

12 Feb. 1985.

918

Colonel William G. Eckhardt, JAGC, Lieutenant Colonel Arthur L. Hunt, JAGC, Major Robert M. Ott, JAGC, and Captain Mark W. Harvey, JAGC, were on the pleadings for appellant.

Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Major Larry D. Williams, JAGC, and Captain Frederick A. Johnson, JAGC, were on the pleadings for appellee.

Before SUTER, RABY, and COHEN, Appellate Military Judges.

## OPINION OF THE COURT

RABY, Senior Judge:

Contrary to his pleas, appellant was convicted of larceny of $3500 from the noncommissioned officers' (NCO) club at Fort Leavenworth, Kansas, larceny of $1005.32 in excessive variable housing allowance, housebreaking into the NCO club, and presenting a false claim of $300.30 for dependent travel. Appellant was sentenced to a dishonorable discharge, confinement at hard labor for five years, and reduction to

the lowest enlisted grade. The convening authority approved the sentence.

The following assignments of error warrant discussion.

## I. *Adequacy of Article 32 Investigation*

Appellant asserts that the military judge erred when he denied a defense motion for a new Article 32 investigation. It appears that the Article 32 investigating officer, Major Keebler, received two police reports in his investigative packet relating to alleged thefts of audio-visual equipment, certain shoplifting offenses, and other serious misconduct involving the appellant. Further, Major Keebler went to the NCO club, the scene of both the housebreaking and the $3500 larceny, to look for a potential government witness. While at the club, Major Keebler asked the witness whether she remembered the break-in. Appellant claims that the *ex parte* consideration of the police reports, the visit to the larceny scene at the NCO club, and the *ex parte* discussion with the witness at the NCO club raised a presumption of prejudice requiring that the findings of guilty and the sentence be set aside.

At trial, Major Keebler gave uncontradicted and positive testimony that in his view the two reports were not related to the charges under investigation, that he had informed his legal adviser that he did not intend to consider the information in these reports, and that he had made a notation confirming this decision on his Article 32 investigation report. Major Keebler informed the court that he did not believe these reports had influenced his decision concerning the validity of the charges. He also testified that, after attempting to call the potential government witness (who worked at the NCO club) for over a day and a half, he had finally gone to the club in person. While he did not discuss the case in depth with the witness, he did question her to see if she remembered the event, which she did. Major Keebler did not obtain enough detailed information from her at this meeting to influence his decision in any way.

At the outset, we note that, even though an Article 32 investigating officer's recommendations are only advisory, the appellant is statutorily entitled to a thorough and impartial investigation under the provisions of Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832 (1982) [hereinafter cited as UCMJ]. Thus, the appellant is entitled to have the proceedings conducted in a fundamentally fair manner, even though the Military Rules of Evidence (M.R.E.) generally do not apply to Article 32 investigations. M.R.E. 1101(d). Under most circumstances, defects in Article 32 investigative proceedings do not deprive courts-martial of jurisdiction. *United States v. Parker*, 19 C.M.R. 201 (C.M.A. 1955). Assuming *arguendo* that Major Keebler's conduct constituted a defect in the proceedings, we must test for specific prejudice to determine what, if any, relief is warranted. *United States v. Cunningham*, 20 C.M.R. 402 (C.M.A.1961). Recognizing that it is inherently difficult for an appellant to demonstrate what prejudice, if any, results from the *ex parte* actions of an Article 32 investigating officer, we will apply a presumption of prejudice to such conduct. *United States v. Payne*, 3 M.J. 354, 357 (C.M.A.1977). After carefully considering the testimony of Major Keebler and other relevant matters of record, we find that the presumption of prejudice was overcome by clear and convincing evidence. *Cf. United States v. Payne, supra; United States v. Clark*, 11 M.J. 179, 183 (C.M.A. 1981). Accordingly, we find this assignment of error to be without merit.

Additionally, however, appellant's former wife, Gracie (Martel) Hendrix, was allowed to testify at the Article 32 investigation over defense objection concerning certain matters which, as will be hereafter discussed, constituted privileged communications within the meaning of M.R.E. 504(b). Moreover, Major Keebler considered similar information contained in the sworn written statement of appellant's wife which was also included in the initial reports he received after being appointed as the Article 32 investigating officer. While generally the military rules of evi-

dence are not applicable to Article 32 investigations, the rules with respect to privileges are applicable. M.R.E. 1101(d). Accordingly, it was error for Major Keebler to consider this information in arriving at his advisory recommendations as to case disposition. In assessing the impact of this error, it is proper to test for specific prejudice to the appellant. *United States v. Cunningham, supra.* We will not presume the existence of prejudice because, unlike a situation in which the Article 32 investigating officer acts *ex parte*, this alleged error occurred during the Article 32 hearing and in the presence of appellant and his counsel, enabling this Court to assess the effect of this error without resorting to the use of such a presumption. We find no fair risk that this error materially affected the Article 32 investigating officer's recommendations or misled the convening authority "in his prosecutorial decision to determine the appropriate level of court-martial or what charges should be referred." *United States v. Clements*, 12 M.J. 842, 845 (A.C.M.R.), *pet. denied*, 13 M.J. 232 (C.M.A.1982); *see also United States v. Stark*, 19 M.J. 519, 525 (A.C.M.R. 1984). Moreover, if a presumption of prejudice were invoked as to this error, we find that the testimony at trial of Major Keebler, the limitations placed by him on the scope of Gracie Hendrix's testimony at the Article 32 hearing, the contents of Appellate Exhibit VI (Article 32 investigation report and allied papers), the nature of the pending charges, the unsettled state of the law concerning confidential marital communications, and the advisory nature of Major Keebler's recommendations as to case disposition overcome any presumption of prejudice by clear and convincing evidence. *See United States v. Payne, supra.*

## II. *Privileged Communications Between Former Spouses*

a. The Pertinent Facts.

Appellant married Gracie Hendrix in 1980 and they were divorced in March of 1983. From September 1981 until February 1982, appellant resided in on-post quarters at Fort Leavenworth, Kansas, with his wife, his two children, and his brother-in-law, Billie Pruett. Appellant worked at the local NCO club. He was one of five people who had access to the combination of the club's safe.[1] In December 1981, Billie helped appellant measure two large rooms in the club so that a New Year's party seating plan could be made. The two entered, but did not measure, the cashier's cage. A few days later, appellant explained to Billie how a person could get into the club's building. In January 1982, appellant brought the subject up repeatedly, discussing the plan on a daily basis toward the end of January. Initially, appellant indicated that the entry could be accomplished by someone. Later in January, appellant's statements began to indicate that he could personally execute such a plan. Billie tried to dissuade appellant by pointing out weaknesses in the plan, but appellant countered these arguments. On one occasion, appellant discussed his belief that on a Sunday he could park at the theatre, get underneath the club unobserved, cut a hole with a handsaw in the floor, and thus gain access to the cashier's room where the safe was kept. The appellant indicated that Sunday was chosen as the day of entry because the theft would likely not be discovered until Tuesday. Appellant did not, however, state to Billie that he had decided to break into the club.

On the Sunday preceding appellant's departure for an overseas tour of duty, Billie observed him wearing an olive drab jumpsuit and carrying a zippered canvas bag in which appellant usually kept his tools. Appellant said that he was going to work on his car. He left his quarters between 10:00 and 10:30 a.m. and did not return until between 2:00 and 2:30 that afternoon. Neither appellant nor his wife, Gracie, thereafter told Billie that appellant had broken into the club, although Gracie later told Billie that someone had done so. Both

---

1. Of these five people, the evidence of record establishes that only the 105 to 110 lb. appellant could fit through the relatively small hole cut in the club floor.

appellant and Gracie had the opportunity to tell Billie about the break-in had they desired to do so. Neither of appellant's two children were told or were otherwise aware that appellant had broken into the club.

Gracie Hendrix was allowed to testify against appellant, over defense objection, as follows. She was married to the appellant from 1980 to March 1983. In December 1981 and January 1982, appellant discussed a plan to steal money from the NCO club by cutting a hole through the floor with a "key hole type saw." During January, he began to mention his plan on a daily basis. The appellant had done everything he could to avoid transfer overseas, as he did not have the money to pay for his family's moving expenses. He told his wife that the money from the NCO club larceny could be used to offset these expenses. On Sunday, 31 January 1982, appellant dressed in somewhat faded green fatigues and told Gracie that he was going to the NCO club to commit the larceny he had planned. He also requested that Gracie respond to any inquiries by saying he was working on a car. He left between 9:00 and 9:30 a.m. with his canvas tool bag. Appellant weighed 105 pounds. At about 11 a.m., appellant phoned from the post theater, told Gracie that the keyless entry system was not working on their car trunk, and asked Gracie to bring him a set of spare car keys. As Gracie was looking for the spare keys, the appellant called again to say that the keys were no longer needed because he had gained entry to the car trunk. Appellant also said that "everything was going fine, as planned." Later that evening (after appellant's second return home which was between 4 and 5 p.m.), appellant asked Gracie to come to their bedroom, saying, "I want to show you something." Pulling back the bed covers, the appellant revealed paper currency, rolled coins, and loose change in separate piles. Contemporaneously, appellant told Gracie that "everything went okay," noting that he had gotten around $3200 rather than $3000.

The evidence of record establishes that subsequently, between 4 and 6 p.m., appellant and Gracie got into their car, taking with them the olive drab canvas tool bag and an open sack containing the fatigue clothing and shoes worn by appellant during the club larceny. Gracie did not open the tool bag. They drove to a grocery store and Gracie threw both items into the dumpster, disposing of the tools as well as the clothing because appellant believed that the tools might reveal carpet fibres and wood from the flooring and therefore could be matched with the crime scene. Around 11 p.m., appellant and Gracie filled a three pound coffee can with change stolen from the club and drove to the family's new residence in Atchinson, Kansas, leaving the can of coins at the residence so that Gracie would have access to them. The paper currency was not taken to Atchinson. Before leaving for Germany on 1 February, appellant gave Gracie about $2000 of the stolen currency, keeping about $1000. Knowing it was wrong to use stolen funds, Gracie nonetheless bought a car for $1200, spent $300 for propane gas, paid a $225 rent deposit, and paid light and telephone deposits from these funds.

■ Gracie also testified regarding appellant's false dependent travel claim and larceny of variable housing allowance,[2] in pertinent part, as follows. Appellant knew that Gracie lived in Atchinson, Kansas, because they had looked at the house together. Appellant had sent three dozen letters or more to Gracie at the Atchinson address. The appellant and Gracie never discussed moving to Manchester, New Hampshire, nor did Gracie or appellant's children visit

---

**2.** Appellant filed a false dependent travel claim against the United States claiming that his dependents had moved to Manchester, New Hampshire, when they had only moved to Atchinson, Kansas (Charge III and its Specification).

Subsequently, appellant also stole excessive variable housing allowance that was erroneously paid to him based on a zip code for Manchester, New Hampshire (Specification 2 of Charge I).

Manchester during appellant's overseas tour.[3]

b. Resolution of Controverted Facts.

■ At trial, defense presented a motion in limine, citing the confidential (marital) communications privilege, M.R.E. 504(b), to preclude Gracie from testifying as to certain statements made by and acts of appellant relating to the larceny from the NCO club. In the process of ruling on the motion, consistent with his responsibility under M.R.E. 104(a), the military judge made mixed findings of fact and law concerning the spousal privilege. Having carefully examined the trial record, we find that certain of the judge's factual findings cannot be sustained. We will use our statutory fact finding power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to resolve the most relevant, controverted factual issues. For the purpose of resolving the applicability of M.R.E. 504(b) to the various conversations between appellant and his wife regarding the appellant's housebreaking and larceny offenses, we find the following facts:

1. During the period November 1981 through January 1982, the appellant, his two children, his wife (Gracie Hendrix), and his brother-in-law (Billie Pruett) lived together as a family unit in government quarters at Fort Leavenworth, Kansas.

2. During this period, appellant engaged in numerous conversations with Billie which detailed a plan to steal currency from a safe in the Fort Leavenworth, Kansas, NCO club.

3. During approximately the same period, but on separate occasions, appellant had numerous conversations with his wife concerning a plan to break into the club, which were basically the same as those he was having with Billie Pruett.

4. On 31 January 1982, when appellant phoned his wife to request a duplicate set of car keys, Gracie believed that appellant wanted to open the trunk to recover a set of keys which were locked therein. Gracie did not assist (aid or abet) the appellant in his criminal activities of housebreaking and larceny and she was not otherwise a coactor in these offenses.

5. Although both appellant and his wife had ample opportunity to do so, they intentionally did not reveal to Billie Pruett any of their communications of 31 January or 1 February 1982 concerning appellant's departure from their quarters to the club, his illegal entry into and theft from the club, the disposition of the clothing worn and tools used during the appellant's housebreaking, or the disposition of the stolen currency by either party. After the criminal investigation began, however, Gracie did tell Billie that she knew appellant "did it", and Gracie and Billie thereafter discussed the theft to aid their memories of the incident and of the appellant's activities pertaining thereto.

6. Prior to appellant's departure for Germany, the only matter relevant to the theft which appellant and Billie discussed was appellant's plan for breaking into the club and stealing the safe's currency.

7. Between 4 and 6 p.m., 31 January 1982, after appellant showed Gracie the stolen currency, Gracie voluntarily elected to help the appellant dispose of the clothing worn and the tools used during the housebreaking. Gracie threw these items into the dumpster after she was driven to the dumpster site by the appellant.

8. Prior to appellant's departure for Germany on 1 February 1982, Gracie knowingly and voluntarily received stolen property from appellant. This stolen property consisted of a coffee can filled with coins, which was transported to the family's new residence in Atchinson, Kansas, and about $2000 in currency. Gracie subsequently

---

**3.** We find that the information contained in this paragraph is not derived from confidential communications made during marriage within the meaning of M.R.E. 504(b). The facts contained in this paragraph are based on acts and omissions by Gracie Hendrix and the appellant's children and on acts by the appellant which were not intended to be and were not communications within the meaning of this rule. *See United States v. Smith,* 533 F.2d 1077 (8th Cir. 1976); *United States v. Lewis,* 433 F.2d 1146, 1150 (D.C.Cir.1970).

spent this money on a car and family moving expenses.

9. On 24 April 1983, appellant and his ex-wife, Gracie, discussed Gracie's pending court-martial testimony. Billie was present during this conversation, but the conversation did not concern any of the specific acts or statements made to Gracie by appellant prior to his departure for Germany. Billie believed appellant was merely trying to discover whether the two were going to testify.

c. Judicial Application of the Common Law.

■ The Federal Rules of Evidence did not codify the rules pertaining to privileges. Fed.R.Evid. 501. The drafters of the Military Rules of Evidence, however, recognizing the unique needs of the military justice system, drafted rules of evidence to codify the basic provisions of several recognized privileges, including certain rules pertaining to the husband-wife privilege. *Compare* Fed.R.Evid. 501 *with* M.R.E. 501, 504; *see* Manual for Courts-Martial, United States, 1984, App. 22, M.R.E. 501, 504. When this Court interprets the law pertaining to the husband-wife privilege, careful attention must be devoted to the language of M.R.E. 504 and to the Presidential intent inherent therein. It was recognized at the time this rule was promulgated that the law regarding the various privileges was unsettled. Thus, M.R.E. 501(a)(4) provides for the judicial application of common law principles, as recognized by the federal district courts pursuant to Fed.R.Evid. 501, insofar as such application is practicable and not inconsistent with the Uniform Code of Military Justice or the Manual for Courts-Martial.

■ M.R.E. 501(a)(4) vests military courts with substantial authority to resolve inconsistencies and deficiencies in the rules of evidence pertaining to privileges by applying principles of common law. While this cannot be an aleatoric process, this Court clearly is empowered to apply one principle of federal common law to the exclusion of another. Accordingly, we will attempt to resolve any deficiencies or ambiguities found in M.R.E. 504(a) by interpreting and applying those federal common law principles which seem, in the light of our reason and experience, most compatible with the unique needs of military due process. *Cf. Wolfle v. United States*, 291 U.S. 7, 12, 54 S.Ct. 279, 279, 78 L.Ed. 617 (1934).

d. The Scope of the M.R.E. 504(b) Privilege.

In this case, the facts establish that the communications in question were communications either between appellant and his brother-in-law, Billie, or between appellant and his wife, Gracie. We find, as did the military judge, that the appellant discussed his plans to steal club funds on separate occasions with his wife and his brother-in-law. The evidence does not establish that any confidential communications between appellant and his wife were discussed in the presence of Billie, and we so find. We also find that appellant intended to and did, in fact, limit his discussions with Billie regarding the theft of club funds to his formulation and perfection of the criminal plan.

■ To facilitate judicial resolution of the convoluted issues in this case, we will examine appellant's statements and conduct in the stages in which they occurred, labeling these stages of criminal conduct the planning stage, the preparation and execution stage, the revelation stage, and the concealment stage. Each of these stages must be considered in light of the applicable law pertaining to the privilege based on confidential communications between a husband and wife.

■ We note that M.R.E. 504(b) pertains only to confidential communications made to a spouse during marriage. Such communications must have been made privately and must not have been intended to be disclosed to third persons other than to those reasonably necessary for transmission of the communication. M.R.E. 504(b)(2). It has been generally recog-

nized, as a matter of common law, that any private communication between spouses is presumed confidential and thus privileged; however, this presumption can be negated by proof that the communication, although uttered in private, was of such a nature or was made under such circumstances as obviously to have been intended to be subsequently conveyed to other persons. *Wolfle v. United States*, 291 U.S. at 14, 54 S.Ct. at 280; *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954); *see Blau v. United States*, 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951); *United States v. Thompson*, 716 F.2d 248 (4th Cir.1983); *see also Hipes v. United States*, 603 F.2d 786 (9th Cir.1979); *Fraser v. United States*, 145 F.2d 139 (6th Cir. 1944). Once the presumption of confidentiality attaches, the government bears the burden of overcoming it. *See United States v. Thompson*, 716 F.2d at 250, *citing Blau v. United States*, 340 U.S. at 333, 71 S.Ct. at 302; *Hipes v. United States*, 603 F.2d at 788. Based on the guidance contained in M.R.E. 501(a)(4), we find this presumption entirely consistent with the provisions of M.R.E. 504(b) and applicable to the private communications made during marriage by appellant to his spouse, Gracie Hendrix.

As all of appellant's marital communications to Gracie regarding his plan to steal money from the club were made in private, presumably such communications were confidential within the meaning of M.R.E. 504(b) and thus privileged. However, substantially similar information was transmitted on numerous occasions by appellant to his brother-in-law. These communications did not have to be disclosed to Billie by appellant in order to accomplish the transmission of similar information to Gracie. The record also establishes that during the planning stage appellant discussed his plan to enter the club and steal money therefrom in great detail with Billie, using Billie as a sounding board during the perfection of the plan. Consequently, we find that the appellant intended that his communications to Gracie concerning the planning stage of this criminal venture would be conveyed to a third person, Billie. Thus, all such communications made during the planning stage of the club larceny fail to meet both the definition of a "confidential" communication under M.R.E. 504(b)(2) and the test for confidentiality as generally applied in the federal courts. Accordingly, these communications were not protected from disclosure in court by the marital communications privilege. *See Wolfle v. United States*, 291 U.S. at 14, 54 S.Ct. at 280; *see also* M.R.E. 510.

On the morning of 31 January 1982, appellant dressed in a set of fatigues and left his quarters carrying his green canvas tool bag. The spousal privilege pertaining to confidential communications generally does not extend to mere acts. *Pereira v. United States*, 347 U.S. at 6, 74 S.Ct. at 361; *see United States v. Smith*, 533 F.2d 1077, 1079 (8th Cir.1976); *United States v. Lewis*, 433 F.2d 1146, 1150 (D.C. Cir.1970); *United States v. Lustig*, 555 F.2d 737, 748 (9th Cir.1977). Thus, we find that these obviously noncommunicative acts are not "confidential communications" within the meaning of M.R.E. 504(b). We also note that appellant engaged in a conversation with Billie on the morning of 31 January while wearing this clothing (although Billie recalled a green jumpsuit) and while in possession of his green canvas tool bag. We infer from this conduct that appellant never intended the above acts to be confidential. Accordingly, even if these acts constituted some form of communication which we hold they did not, the spousal privilege would not have inhibited Gracie's testimony concerning the tool bag and appellant's state of dress that morning.

We find that on several occasions during the morning and afternoon of 31 January 1982 appellant engaged in private conversations with Gracie. These conversations included his announced intention to go to the club and steal the money, two subsequent telephone conversations concerning his car trunk's locking system and the need for keys, and a short afternoon conversation when he came home from the

club for an apparent coffee break. As these conversations were communications uttered in private by appellant to his wife, the presumption that they constituted confidential communications applies. The government has failed to overcome the presumption of confidentiality cloaking these conversations. These utterances were separate from the planning conversations that appellant had with both Gracie and Billie and did not pertain to the planning stage, but rather to the preparation and execution stage of appellant's criminal venture. It cannot be inferred that the appellant intended the disclosure of these spousal communications to Billie, or to any other person, merely because he earlier had discussed certain planning aspects of the crime with Billie. In fact, appellant was careful to conceal his true destination from Billie when he left the house to commit the crime, giving Billie the same false excuse which he had directed his wife to use in response to inquiries regarding his activities. Following the larceny from the club, neither appellant nor Gracie chose to confide in Billie regarding the conversations that occurred between the two spouses after the planning stage of the criminal venture. Moreover, we note that Gracie was not a co-actor in appellant's housebreaking and larceny. Her complicity did not occur until a later time, as we will hereafter discuss. Accordingly, we find that these conversations constituted confidential communications within the meaning of M.R.E. 504(b).

■ Upon appellant's return to his quarters after stealing currency from the club, he summoned his wife to the privacy of their bedroom. During the course of their exchange, he revealed that his criminal venture at the club was completed. He told her that the stolen money amounted to about $3200. All private communications made to Gracie during this revelation stage enjoy the presumption of confidentiality. Consistent with our analysis regarding the

confidential communications made by appellant during the preparation and execution stage, we find that the government has failed to overcome this presumption. Accordingly, these conversations constitute confidential communications within the meaning of M.R.E. 504(b).

■ The period we have labeled the "revelation stage" began when appellant summoned his wife to their bedroom. Although the record could be far more clear in this regard, we find that appellant's first act when his wife appeared at the bedroom door was to pull back the bedsheet on their bed, revealing piles of currency and stacks and rolls of coins. In this Thespian fashion, appellant first revealed to his wife that he had successfully purloined funds from the club. Although the acts of one spouse generally do not constitute confidential communications with the other, the federal courts have carved an exception to this rule when one's acts are intended to convey a private message to the spouse. *Compare United States v. Lustig*, 555 F.2d 737, 748 (9th Cir.1977), *with United States v. Lewis*, 433 F.2d 1146, 1150–51 (D.C.Cir.1970). ("Some acts conceivably may so convey a message, and may so bespeak a trust, as to necessitate nothing more to demonstrate entitlement to the privilege."); *see United States v. Sykes*, 697 F.2d 87, 89 n.1 (2d Cir.1983); 8 Wigmore, *Evidence* § 2337 (McNaughton rev. 1961); *see also* 81 Am. Jur.2d *Witnesses* § 161 (1976). Thus, a spouse's acts, whether accomplished by expression or gesture, must either be communicative *per se* or intended to convey a private message in order to support an invocation of the spousal privilege. *See United States v. Smith*, 533 F.2d at 1079. As no reliable test has been devised which can be universally applied to categorize acts either as communicative or noncommunicative, each case must be resolved on its facts. *See* 8 Wigmore, *Evidence* § 2337, *supra*.[4] The appellant obviously intended

---

4. However, Wigmore did observe that "[i]n some cases—those in which there is something in the way of an invitation by the husband of the wife's presence or attention or there are

other indications that he intends for her to acquire knowledge of his act—the act is as much a communication as his words to her describing the act would be. Such an act falls

to surprise his wife by cleverly revealing to her the success of his criminal venture. He summoned Gracie, and Gracie alone, to the most private part of the home—their bedroom. When she arrived at the door, appellant flung back the sheets on their waterbed to reveal the spoils of his larcenous adventure. Under these conditions, his acts obviously were intended to be and were, in fact, communicative in nature. As these communicative acts were conducted in spousal privacy, the presumption of confidentiality is applicable to them. We find that appellant did not intend that Gracie reveal the details of these communicative acts to anyone, and at no time did appellant reveal this information to Billie or to any other person. Accordingly, we conclude that the government has failed to overcome the presumption of confidentiality and that these acts constitute confidential communications under M.R.E. 504(b).

The evidence of record indicates that shortly after appellant revealed the fruits of his theft to his wife, he engaged in a pattern of conduct designed to distribute the stolen money between his wife and himself and to destroy evidence which might connect him with his crime. We will refer to this conduct as the concealment stage.

■ We find that the appellant's act of driving his wife to the grocery store dumpster was not a communicative act because no special message was intended to be conveyed to her by this conduct. Thus, the basic rule applies that the spousal privilege generally extends only to utterances and not to acts. *Pereira v. United States,* 347 U.S. at 6, 74 S.Ct. at 361. The same analysis can be applied to the noncommunicative acts of Gracie when she thre the bag of tools and the sack of clothing into the dumpster. Further, we find that Gracie is not precluded from testifying as to her own acts, as these acts were not inextricably bound to any privileged communication by or with appellant. *See* 81 Am.Jur.2d *Witnesses* § 161 (1976). Moreover, as there

was no apparent attempt to conceal the above acts and as they occurred openly in a public setting, in plain view of anyone coincidentally present, they were not "made privately" within the meaning of M.R.E. 504(b)(2). Thus, even if these acts had been otherwise communicative in nature, we would decline to invoke the presumption of confidentiality in support of appellant's claim of spousal privilege.

■ We also find, based on the competent evidence of record, that at the time Gracie entered the car to be driven to the dumpster she began her voluntary participation in a joint criminal venture with appellant. This venture was for the purpose of concealing the latter's housebreaking of and larceny at the club. Moreover, we find that her act of throwing away the tools, tool bag, and clothing was done for the express purpose of concealing appellant's felonious misconduct from both military and civilian authorities. This entire course of conduct constituted patently illegal criminal activity. *See, e.g.,* Article 78, UCMJ, 10 U.S.C. § 878; Article 134, UCMJ, 10 U.S.C. § 934; 18 U.S.C. §§ 2, 3, 4, 13, 641, and 661 (1982); 21 Kan.Stat.Ann. § 3812 (1981). When both spouses are substantial participants in patently illegal activity, neither spouse can prevent the other from testifying concerning spousal acts and communications that pertain to their joint criminal venture. *See United States v. Kahn,* 471 F.2d 191, 194 (7th Cir.1972), *rev'd on other grounds,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Consequently, conversations between spouses regarding crimes in which they are jointly participating do not constitute marital communications for purposes of the marital privilege, and thus are not entitled to protection as confidential marital communications. *United States v. Mendoza,* 574 F.2d 1373, 1381 (5th Cir.1978), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *United States v. Entrekin,* 624 F.2d 597 (5th Cir.1980); *United States v. Clark,* 712 F.2d 299 (7th Cir.1983); *accord United*

within the policy of the privilege." *Id.* at page 658. If we were to adopt this view as a test of

communicative acts, the facts of this case would meet this criterion with ease.

States v. Ammar, 714 F.2d 238, 258 (3d Cir.1983) (communications between spouses as to ongoing or future criminal activities are not protected); *United States v. Price*, 577 F.2d 1356, 1365 (9th Cir.1978), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979); *cf. United States v. Cotroni*, 527 F.2d 708 (2d Cir.1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976) (declining to determine the applicability of the rule to the 2d Circuit and deciding the issue on other grounds).

Balancing the need for truth in criminal trials against the importance of the policy behind M.R.E. 504(b) in the light of reason and experience, we conclude that the "joint participant" exception applies to the spousal privilege of M.R.E. 504(b). *Cf. Wolfle v. United States*, 291 U.S. at 12, 54 S.Ct. at 279; *United States v. Mendoza*, 574 F.2d at 1381. Applying the joint participant rule to the case at bar, we find that none of the acts of or communications between appellant and Gracie which occurred while the two were in the car en route to the dumpster and which pertained to their joint criminal venture are protected by the marital privilege of M.R.E. 504(b). Similarly, neither the conversations between nor the acts of appellant and Gracie which pertained to the concealment, transportation, receipt, or disposition of the stolen money and which occurred after they entered their joint criminal venture[5] to conceal appellant's housebreaking and larceny of club funds were protected by the privilege of M.R.E. 504(b).

e. Waiver of Marital Communications Privilege.

Following the military judge's adverse ruling on the defense motion in limine and the presentation of the government's case-in-chief, appellant elected to testify in his own behalf. During his testimony, appellant denied that he had broken into the club and stolen money. He maintained that,

except for a very brief period during which he went to the store to get some soda, he was at home packing on 31 January 1982. Appellant testified at length on direct examination concerning subsequent conversations with Gracie about family problems, the division of their marital property, and whether Gracie would testify truthfully in court. He did not, however, testify on direct examination as to his confidential communications with Gracie regarding the housebreaking and larceny. In response to questions by the trial counsel on cross-examination, appellant denied discussing with Gracie or Billie plans to break into the club, phoning Gracie on 31 January 1982, calling Gracie to their bedroom, showing her the stolen money on their bed, driving to the grocery store's dumpster to dispose of a tool bag and a paper sack, filling a coffee can with stolen coins, or making any trips to Atchinson. Appellant maintained during cross-examination that Gracie's testimony was "[t]otal fabrication." On redirect examination, appellant noted that he had asked his daughter to bring his only zippered canvas bag to court, disagreeing with Gracie's contention that they had discarded the tool bag allegedly used during the club theft. In response to questions from court members, appellant stated that he recalled neither detailed conversations with Gracie or Billie about NCO club operations nor casual comments he may have made to them about stealing from the club.

Some federal courts have found that a defendant can waive the marital privilege by voluntarily testifying about matters which the accused's spouse could refute or contradict. *United States v. Benford*, 457 F.Supp. 589 (E.D.Mich.1978); *see also United States v. Burkhart*, 501 F.2d 993, 995 (6th Cir.1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). Military law provides that a de-

---

**5.** In addition, we find that appellant and Gracie were also jointly engaged, during the concealment stage of the larceny and housebreaking offenses, in the wrongful disposition and receipt of stolen property. *See, e.g.,* 18 U.S.C. § 662 (1976); Article 134, UCMJ. Moreover, we also find that Gracie's involvement in the transportation and disposal of the stolen money did not constitute and was not intended to be communicative conduct protected by the privilege of M.R.E. 504(b).

fendant does not waive a privilege pertaining to a confidential communication by testifying in his own behalf unless such testimony concerns the communication to which the privilege pertains. M.R.E. 510(b). In *United States v. Gibbs*, 4 M.J. 922, 923 (A.F.C.M.R.1978), the court held that "[a]n accused does not waive the privilege merely by testifying in his own behalf. However, if he testifies to the confidential communication *during direct examination,* the privilege is thereby waived and he may be cross-examined fully on the matter" (emphasis supplied).

 This interpretation is compatible with long standing precedent of the United States Court of Military Appeals. *See United States v. Trudeau*, 23 C.M.R. 246 (C.M.A.1957). However, the case at bar is clearly distinguishable. Appellant timely attempted to invoke his marital privilege under M.R.E. 504(b), but the military judge granted appellant's motion in limine neither in whole nor in part. Attempting to capitalize on the military judge's erroneous ruling, the government elicited from Gracie testimony regarding certain confidential communications and communicative acts. Appellant took the stand in his own behalf, but did not testify regarding these confidential communications during his direct examination and only briefly mentioned his tool bag during redirect. During cross-examination and in response to questions from courtmembers, appellant did respond to questions concerning these matters. However, his responses were either denials of such communications or assertions that he could not recall such events. Thus, if appellant ventured beyond "a mere denial of complicity," he did not stray far and then only with the government's prodding. *Compare Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), *with* these facts. In *United States v. Brown*, 634 F.2d 819 (5th Cir.1981), the court considered whether the marital privilege was waived by a witness who had denied certain conversations with his wife on cross-examination. Though holding that this waiver issue was itself waived because it was not timely asserted at the trial level,

the court noted that "while a communications privilege may arguably be waived by any form of consented disclosure, *a serious question is raised* where, as here, the trial judge himself instructs the disclosure." 634 F.2d at 829 (emphasis added).

We recognize that "waiver may be found in ... some act of testimony *which in fairness* places the person in a position not to object consistently to further disclosure." 8 Wigmore, *Evidence* § 2340(2) (McNaughton rev.1961) (emphasis added). However, we conclude that admission of substantial portions of Gracie's testimony in this case was error, based upon our finding that it is fundamentally unfair to invoke a waiver of marital privilege when an appellant timely asserts the privilege at trial, is erroneously thwarted in this effort by the military judge, scrupulously avoids testifying as to the privileged communications on direct examination, and denies engaging inthese acts and conversations in response to questions posed by the government and the court members. To hold otherwise would provide the government with an unfair advantage and a virtually unrestrained opportunity to circumvent the President's intent in promulgating M.R.E. 504(b). This we will not do. Moreover, the government's failure to raise the issue of appellant's waiver of the marital privilege at trial circumscribes our ability to review this issue on appeal absent plain error. *See United States v. Brown*, 634 F.2d at 829.

f. Effect of the Error.

 Because we find, after excising the inadmissible evidence of confidential marital communications, that there remains sufficient evidence of record to prove beyond a reasonable doubt that appellant committed the offenses of housebreaking into the club and larceny of its funds, we must additionally determine whether the error committed was prejudicial or harmless. It is well established that "[e]rror not of constitutional dimension may be found harmless only upon the determination either that the finder of fact was not influ-

enced by it, or that the error had but a slight effect on the resolution of the issues of the case." *United States v. Barnes,* 8 M.J. 115, 116 (C.M.A.1979); *United States v. Bledsoe,* 19 M.J. 641, 645 (A.F.C.M.R. 1984). In determining whether the error was, in fact, harmless, this Court should consider all relevant factors of record, including the nature and scope of the error, whether the trial was before members or judge alone, the comparative strength of the government's case, and to what extent, if any, the credibility of the witnesses was affected by the error. The nature of this error is nonconstitutional. The military rules of evidence pertaining to spousal privilege are not grounded on principles of military due process. These rules were strictly created by Presidential Executive Order, albeit based upon very important policy and disciplinary considerations. The error in this case permitted the erroneous receipt in evidence of testimony by appellant's former wife regarding appellant's express intent to commit the crimes of housebreaking and larceny, his announced departure from their quarters to commit these crimes, his subsequent confession to his wife that he had, in fact, committed the crimes, and his open revelation to her of the location of the stolen funds. This inadmissible evidence was presented to a blue-ribbon, fact-finding body composed of officer and enlisted court members who presumably based their findings on all the evidence admitted.

▬▬ After excising the inadmissible evidence, this Court finds the strength of the government's case noticeably weakened. The government's case now rests on an underpinning of circumstantial evidence. Conversely, the strength of the defense's case is substantially improved. During trial, the credibility of the witnesses was strongly contested by both sides. Thus, the consistency or inconsistency of the "in court" testimony in relation to the other admissible evidence was an important factor at the trial level. Finally, we note that the inadmissible evidence included appellant's confession to his wife that he had committed the two offenses as planned.

While the admission into evidence of a statement improperly obtained by law enforcement authorities has been held to mandate reversal of a conviction based thereon regardless of other evidence of guilt, *United States v. Michaud,* 2 M.J. 428, 432 (A.C.M.R.1975); *but see United States v. Charlton,* 34 C.M.R. 660, 663 (A.B.R.1964), the error inherent in the improper admission of a confession rendered to one acting without official sanction does not ordinarily require summary reversal but must, rather, be tested for prejudice, *see United States v. Trojanowski,* 17 C.M.R. 305 (C.M.A.1954). In the instant case, the improperly admitted evidence included appellant's private confession to his wife, rather than a confession elicited by the government or its agents. Under these circumstances, this Court will test for prejudice.

Considering the above factors, we cannot conclude either that this error did not substantially influence the fact finders or that it had only a slight effect on their resolution of the issues involved. Accordingly, we resolve this issue in favor of the appellant and will set aside the tainted findings of guilty and authorize a rehearing thereon.

### III. *Other Assertions of Error*

Appellant additionally alleges that it was error to serve military defense counsel with a copy of the record of trial and the post-trial review after appellant had asserted the "ineffective assistance of [such] counsel" on his appellate rights form. In view of our disposition of this case, this issue is moot; however, in future cases, staff judge advocates and trial defense counsel should carefully consider the lesson intended by *United States v. Stith,* 5 M.J. 879 (A.C.M. R.1978). Such appellate issues could be avoided by timely appointing another military defense counsel to perform the necessary post-trial functions when it becomes known that the accused is asserting inadequate representation during trial by military defense counsel.

We have considered the other issues personally raised by appellant and the remaining issues briefed by his counsel and find them to be without merit.

### IV. *Disposition*

The findings of guilty of Specification 2 of Charge I and Charge I and of Charge III and its Specification are affirmed.[6] The findings of guilty of Specification 1 of Charge I and of Charge II and its Specification are set aside.[7] The sentence is set aside. The record of trial is returned to The Judge Advocate General for submission to the same or a different convening authority. The convening authority may order a rehearing as to Specification 1 of Charge I, as to Charge II and its Specification, and as to the sentence. If he determines that a rehearing on Specification 1 of Charge I and on Charge II and its Specification is impracticable, the convening authority may dismiss Specification 1 of Charge I and Charge II and its Specification and order a rehearing on the sentence only. If the convening authority dismisses these specifications and determines that a rehearing on the sentence is impracticable, he may reassess the sentence.

Chief Judge SUTER and Judge COHEN concur.[8]

---

6. Specification 2 of Charge I involves larceny of about $1005.33 in excessive variable housing allowance payments. Charge III and its Specification pertain to a false dependent travel claim in the amount of $300.30.

7. Specification 1 of Charge I involves larceny of about $3500 from the NCO club. Charge II and its Specification allege housebreaking into the NCO Club.

