**UNITED STATES**

v.

**Staff Sergeant Marcus W. STEPHENS, United States Air Force.**

ACM 36682.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 29 Oct. 2005.

26 March 2008.

Appellate Counsel for the Appellant: Terri R. Zimmermann (argued), Lieutenant Colonel Mark R. Strickland, Captain Christopher L. Ferretti, and Captain Anthony D. Ortiz.

Appellate Counsel for the United States: Major Brendon K. Tukey (argued), Colonel Gerald R. Bruce, Major Matthew S. Ward, Major Kimani R. Eason, Captain Daniel J. Breen, and Captain Jefferson E. McBride.

Before FRANCIS, SOYBEL, and BRAND, Appellate Military Judges.

OPINION OF THE COURT

SOYBEL, Judge:

Contrary to his pleas, the appellant was found guilty of one specification of attempted carnal knowledge, one specification of attempted sodomy of a child, and one specification of committing an indecent act upon a female under the age of 16 years, in violation of Articles 80 and 134, UCMJ, 10 U.S.C. §§ 880, 934.

The appellant was charged with committing several sexual offenses against his young cousin-by-marriage, BU. The acts allegedly occurred on two separate occasions, in December 2003 and August 2004. He was acquitted of the charged acts relating to the earlier date but convicted of acts which occurred in August 2004. At that time, BU was 13 years old.

In August 2004, the appellant attended a get-together at his grandparent's farm in Gilmer, Texas. According to BU, the appellant invited her to accompany him on a walk to shoot his gun and walk to a creek located approximately a quarter of a mile from the house. BU testified the appellant stopped and initiated sexual contact with her several times during their walk. The sexual contact increased at each stop and culminated behind a barn near the house, where she stated the appellant pulled down her pants and underwear and performed various sexual acts upon

her. According to BU, she started to cry and told the appellant she was scared. He told her he would not do anything more and would wait until a later time before going any further. The appellant did not testify at trial.

The appellant raises a total of seven issues. One issue, containing three sub-issues, involves the Article 32, UCMJ, 10 U.S.C. § 832 investigation. Two issues allege erroneous evidentiary rulings by the military judge involving hearsay, which the appellant contends prevented him from presenting a defense. Two issues relate to rulings by the military judge purportedly allowing statements made by the appellant to investigators and his wife to be used on cross-examination in the event the appellant testified in his own defense. One issue asserts certain testimony by BU's father, made during the sentencing phase of the trial, was improper. Finally, the appellant challenges the legal and factual sufficiency of the evidence. For the reasons set out below we find no error.

### The Article 32, UCMJ, Investigation

The appellant raises three specific issues related to the Article 32, UCMJ investigation on his case. He asserts the investigating officer (IO) considered inadmissible evidence when he read the Air Force Office of Special Investigations (OSI) report to prepare for the hearing; the IO abandoned his neutral and impartial role because he conducted almost all of the questioning of the witnesses himself; and lastly, the IO denied the appellant his right to confrontation by finalizing the witnesses' written statements after the hearing closed and outside of the presence of the appellant.

■ When reviewing allegations of error in an Article 32 investigation we will reverse only when there is a showing of prejudice to a substantial right of the accused. *United States v. Davis,* 64 M.J. 445 (C.A.A.F.2007); *see also United States v. Reynolds,* 24 M.J. 261 (C.M.A.1987); *United States v. Davis,* 20 M.J. 61 (C.M.A.1985). Notwithstanding this precedent, the appellant urges us to apply a presumption of prejudice as expressed in *United States v. Martel,* 19 M.J. 917

(A.C.M.R.1985). We decline to follow this standard of review and will follow the standard espoused in *Davis,* 64 M.J. 445. When reviewing the military judge's findings, we will accept her findings of fact unless they are clearly erroneous. *United States v. Tippit,* 65 M.J. 69, 79 (C.A.A.F.2007); *United States v. Mizgala,* 61 M.J. 122, 127 (C.A.A.F. 2005).

■ In this case, the IO testified at trial. He stated he reviewed a copy of the OSI investigation report before he conducted the Article 32 investigation, but did so only to become familiar with the nature of the case and to focus his questioning. He clearly stated under oath that he did not consider the OSI report when making his recommendations to the convening authority. The military judge found the IO to be credible and found that he did not let the OSI report influence his recommendations to the convening authority.

■ As to the IO conducting most of the questioning of the witnesses, as opposed to the trial counsel, this procedure did not prejudice the appellant. He was present during the Article 32 investigation and had the opportunity to cross-examine the witnesses. Although the procedure deviates from usual Air Force practice, we note Article 32, UCMJ, places the burden on the IO to thoroughly and impartially investigate charges. The burden is not on the government's counsel. In fact, appointment of government counsel is discretionary on the part of the commander who directed the investigation. It was not improper for the IO, acting under this mandate, to conduct the Article 32 investigation in the manner he did. The IO noted one of the government's counsel was due to leave for a new assignment the next day and the other counsel was an inexperienced judge advocate who had never participated in an Article 32 investigation. Further, because of his extensive experience as an administrative law judge,[1] he felt very comfortable questioning witnesses, especially the young victim in this case. We agree with the military judge that the IO was merely trying to gain a clear understanding of the events and facts per-

---

1. The IO was a reserve judge advocate.

taining to the charged offenses and was not taking on the role of government counsel or abandoning his impartial role.

■ Finally, we point out that the IO in the *Martel* case, cited above by the appellant, went even further than the IO in the case sub judice, in that he read police reports involving other crimes committed by the accused, went to the scene of the offense under investigation, and had an ex parte conversation with one of the witnesses. As in this case, the IO in *Martel* testified these events did not influence his decision about the charges he was investigating. Even applying the presumption of prejudice standard, the *Martel* court found the IO's testimony overcame the presumption.

The appellant's final assertion of error regarding the Article 32 investigation involved post-hearing conduct by the Investigating Officer. After taking testimony at the hearing, the IO summarized the witnesses' testimony, mailed each witness a copy of the summarization, then called each witness to have them confirm their respective summaries. The IO testified no substantial changes were made by the witnesses; only minor grammatical corrections. Further, the IO testified he would make adjustments only after he could personally verify the changes from his own recollection of the witness' live testimony. The appellant argues that the IO's action in this case denied him his right to confrontation, as was the case in *United States v. Whitt*, 21 M.J. 658 (A.C.M.R.1985).

In the *Whitt* case, the IO conducted two ex parte sessions with three witnesses and received additional evidence outside the presence of the appellant and his counsel. The convening authority corrected this situation by ordering the IO to reopen the hearing and further ordered him not to consider the new evidence. Even applying a "presumption of prejudice" standard, the court found the convening authority's corrective actions resulted in preventing prejudice to the accused.

This case differs from *Whitt*. In the instant case, the IO did not elicit any new information from the witnesses. He merely had them confirm information already given when the appellant and his counsel were present and had the opportunity to challenge the testimony and ask further questions. Indeed, other than objecting to the procedure utilized by the IO, the appellant can point out neither changes in testimony nor prejudice that resulted from the post-hearing summarization process.

Certainly, if changes in a witness' testimony emerged as a result of this practice, a military judge would be faced with the question of whether the accused received a fair hearing. We do not face that situation in this case. The military judge found the IO was only verifying information obtained during the hearing and did not collect any additional evidence. We see no reason to disturb this finding of fact. *See Tippit*, 65 M.J. at 79. Therefore, we hold that an investigating officer does not violate an accused's right to confront witnesses under Article 32, UCMJ, when he asks witnesses to review and confirm summarizations of their testimony, obtains no new evidence, and no factually relevant changes to the testimony result from the post-hearing contact. If that were to happen then the remedy, as used in *Whitt*, would be to reopen the hearing.

*Evidentiary Rulings Impacting the Appellant's Ability to Present a Defense*

■ The appellant argues the judge erred in several evidentiary rulings. He asserts these rulings prevented him from presenting a defense. At the outset, we should note the theories presented by the government and the appellant at trial. The offenses first came to light when BU's mother read about them in her daughter's personal diary. The government's general theory of the case was that the appellant wanted BU secluded from the others attending the gathering so he could initiate sexual contact with her. In this vein, BU testified the appellant told her they would wait until everyone else had either left the party or went in to take a nap before they went to the creek. On the other hand, the appellant's theory was that BU was not credible and had fantasized about the incidents with the appellant when she wrote about them in her diary, as she had about

other boys from her school.[2]

The first evidentiary issue contested by the appellant involves exclusion of testimony by the appellant's sister. She would have testified the appellant asked her if she wanted to walk to the creek with him and that when she declined the offer, BU volunteered to accompany the appellant on the walk. This evidence would have been offered to show BU was not credible and it was she who asked to go on the walk with the appellant. It would also be used to counter the government's theory of the case that the appellant used the walk to the creek as an excuse to be alone with BU. The judge ruled this testimony was hearsay and inadmissible.

The appellant asserts the military judge erred in her ruling. He cites *United States v. McAllister*, 64 M.J. 248 (C.A.A.F.2007), to support his argument that he was thereby denied his constitutional right to present a defense. The government counters this argument with cases such as *United States v. Carruthers*, 64 M.J. 340 (C.A.A.F.2007) and *United States v. Roberson*, 65 M.J. 43 (C.A.A.F.2007), to assert that although he may have been somewhat limited in his effort, the appellant was not denied his ability to present a defense.

The distinction between these two lines of cases is important. If the appellant was denied the opportunity to present a defense, the error would be of constitutional magnitude. If so, we must determine whether the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). On the other hand, if the defense was merely limited in its ability to present a defense, the error would be considered a nonconstitutional error, and the government need only show that the error did not have a substantial influence on the findings. *United States v. Clark*, 62 M.J. 195 (C.A.A.F.2005) (citing *United States v. McCollum*, 58 M.J. 323 (C.A.A.F.2003)).

*McAllister* involved an Army specialist convicted of unpremeditated murder. He was denied the opportunity to present evidence that three unidentified people's DNA (in addition to his) was found under the victim's fingernails. That evidence, while not excluding the appellant as the possible assailant, would have shown he was not the "sole contributor as the government portrayed him to be." *McAllister*, 64 M.J. at 253. The fact that the appellant's DNA was found under the victim's fingernails was a key factor in his conviction. Our superior court set aside the finding of guilty and the sentence because McAllister was "precluded ... from presenting an entire line of defense to the members." *Id.*

*Carruthers* was a case involving an Army staff sergeant who was convicted of a conspiracy to steal over a million dollars worth of government property. During his trial, one of his co-conspirators testified against Carruthers. Carruthers' trial defense counsel cross-examined the co-conspirator regarding the pre-trial agreement (PTA) he had made with federal authorities. He brought out the fact that by being tried in federal court, the witness would not undergo a court-martial and risk a punitive discharge; that to date, no one had discussed or initiated administrative separation of the witness; that the witness believed what happened to him after the court-martial would depend on his testimony at the appellant's trial; that if he did a good job testifying, the government would "take care of him"; and that he was facing only one count of theft of public property over $1,000 even though he could be facing many more counts. *Carruthers*, 64 M.J. at 342.

The defense counsel was not allowed to inquire about the co-conspirator's understanding of the sentence he would receive under the plea agreement. The military judge also did not allow the defense to bring out any more information regarding the co-conspirator's PTA, explaining that the defense had already made their point concerning the witness' interest in testifying at the appellant's court-martial. The defense objected to the military judge's ruling, arguing the members should know about the details

---

2. BU admitted that she made up entries in her diary concerning boys she knew and these entries were fantasies.

of the witness's PTA because of the possibility he would lie to in order to receive a reduced sentence. *Id.* at 343.

Our superior court found no error in that situation because the defense was not denied "the right to examine the possibility of bias", but rather was "simply limited [in] its ability to inquire about yet another aspect of the plea agreement, when the agreement's bearing on bias had already been thoroughly explored." *Id.* at 344. The Court went on to explain "once the defendant has been allowed to expose a witness's motivation in testifying, 'it is of peripheral concern to the *Sixth Amendment* how much opportunity defense counsel gets to hammer that point home to the jury.'" *Id.* (quoting *United States v. James,* 61 M.J. 132, 136 (C.A.A.F.2005) (citations omitted)).

Clearly this case falls on the same side of the fence as *Carruthers.* Even assuming for the sake of argument that the statement at issue was not hearsay and could have been admitted into evidence, we find no prejudice. Although the military judge's ruling limited some of the evidence the appellant wished to present concerning BU's lack of credibility, he certainly was not denied the opportunity to present his defense that BU should not be believed.

The appellant was able to present evidence which allowed the defense to argue that BU created fantasy entries in her diary about boys she liked and even went so far as to fabricate notes to herself, as if written by boys in whom she had an interest. The defense also pointed out there were pages missing from the diary that were adjacent to the pages describing incidents that led to the charges being brought. They pointed out that the diary entry was not dated, that BU was not as innocent or naive as the government portrayed her, and that she made entries in her diary that conflicted with her testimony at trial. There was even more evidence the defense used to convince the members BU was not credible. The trial defense counsel argued BU was untruthful when she testified she knew her mother would read her diary and discover what happened, that a home video had exposed significant inconsistencies between some of her allegations and what was preserved on the video, and that her timeline of the events was inaccurate. In addition, the defense was able to attack BU's description of the clothes appellant wore as well as her description of a certain truck relevant to one of the alleged incidents. Finally, they were able to argue that her story concerning how the incident physically occurred didn't make sense and that she was untruthful about the appellant touching her inappropriately in a store.

These were but a few of the examples of BU's unreliability put forth by the defense during the closing argument on findings. In all, his argument totaled over 25 pages of the transcript and BU's incredibility was essentially the entire focus. Whether the appellant asked his sister or mother to walk to the creek before he went there with BU is just one more example which may have marginally added to the appellant's defense, but the military judge's ruling certainly did not prevent him from presenting the defense that BU was not credible.

The second evidentiary ruling contested by the appellant is similar to the one discussed immediately above. BU testified that at some point during the August family get-together, the appellant, his sister and BU went to Wal–Mart to shop. BU testified that while they were in the store the appellant held her hand, touched her buttocks, and told her he was going to marry her. During the direct examination of the appellant's sister, the defense counsel asked whether she ever heard any discussion about the appellant marrying BU. The military judge sustained the trial counsel's objection to this question on hearsay grounds. She also ruled that a rephrased version of this question was inadmissible as hearsay. The defense counsel stated he did not want to submit the evidence to prove the truth of the matter asserted (to show the appellant wanted to marry BU), but rather to have the appellant's sister testify that she did not hear the appellant make such a comment. Thus, the defense was only asking whether the words were spoken.

The appellant claims this evidence would have impeached BU. They emphasized that BU was the only witness against the appellant, thereby making the use of this impeach-

ment evidence "crucial" to the defense. For the reasons stated above, even assuming, arguendo, that the military judge's ruling was in error, the appellant was only partially limited in presenting his defense that BU was not worthy of belief and the ruling did not prevent him from presenting that defense to the members. *Carruthers*, 64 M.J. at 344. Finally, although the appellant's sister was not allowed to testify about the statements allegedly made at Wal–Mart, the same evidence was admitted through the testimony of the appellant's wife when the trial counsel failed to object. Any error in not allowing a second witness testify to the same facts is harmless. Given the above, we are convinced that the appellant was merely limited in his ability to present a defense and any error caused by the exclusion of the testimony at issue would be a nonconstitutional error. After reviewing all the evidence admitted at trial, we find any error, assuming, arguendo, there was one, did not have a substantial impact on the findings.

### The Appellant's Decision Not to Testify

 Among the evidence the defense sought to suppress was a statement in an email message from the Army Criminal Investigations Division (CID). The email concerned an interview the CID conducted with the appellant while he was deployed. It read, "[SSgt Stevens] was interviewed and asked for a lawyer—stated 'knew this was coming, surprised it took this long.'" Because no witnesses with knowledge about the circumstances under which this interview occurred were present in court, it was unknown when, in relation to the time the appellant was read his rights under Article 31, UCMJ, the statement was made. In fact, the only evidence that the statement may have been made was the email.

While the military judge granted the defense's motion to suppress the statement, she ruled it was an indication of a consciousness of guilt and could be used to cross-examine the appellant if he testified; even if his testimony consisted of a general denial of the accusations.

Another related evidentiary ruling involved statements made by the appellant to his wife in confidence. His wife later related these comments to law enforcement agents. The appellant indicated he planned on calling his wife to testify about her observations of the events on the day in question. The appellant also filed a motion in limine seeking a ruling from the military judge that would prevent the trial counsel from asking the appellant's wife about those statements because they fell under the husband-wife privilege, Mil. R. Evid. 504. After the military judge granted the appellant's motion and the trial counsel said he would not be asking her about the confidential communications, the military judge stated:

> Okay, just one second. Well I am going to preclude you for now. Obviously if the accused gets on the witness stand and he said things to her, I think it is open, cause she has made those public.... I am just kind of warning you that these things hang out there now over your head—over his head.... Since she isn't testifying about communications ... I won't allow the government to go into those; however, I am just saying that it is hanging out there if the accused takes the witness stand.

Based on the military judge's rulings that the appellant's statement to the CID and his confidential communications to his wife might be used to cross-examine him, the appellant elected not to testify at his trial.[3] He argues on appeal that the decisions by the military judge forced him into choosing between not testifying in his own defense or testifying and then suffering the prejudice of the judge's erroneous rulings. Thus, he claims he was prevented from presenting a defense.

This claim is without merit for two reasons. First, regarding the ruling on the statements covered by spousal privilege, the military judge did not actually make a ruling. Second, the appellant never testified, which is a requirement under military law in order to preserve both issues. *See United States v. Jones*, 43 M.J. 708 (A.F.Ct.Crim.App.1995).

*Jones* clearly states that the witness must actually testify to preserve the issue for ap-

---

**3.** The appellant submitted this information through affidavits to this Court.

peal. *Id.* at 710. In *Jones,* it was the appellant's wife who the defense decided not to call as a witness because of the judge's indication she would deny their motion in limine and allow the wife to be cross-examined on certain matters despite her assertion of the spousal privilege. *Id.* at 709.

In *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the accused decided not to testify after the judge's ruling that allowed the use of a prior conviction for impeachment purposes. The Supreme Court stated that an appellate court would be forced to speculate on the harm caused if the accused never testified. *Id.* at 41, 105 S.Ct. 460. The Court also recognized that the judge may even change his ruling depending on the actual testimony elicited and noted the prosecutor might even decide not to use the evidence that was the subject of the motion in limine. *Id.* at 41–42, 105 S.Ct. 460. *Jones* makes *Luce* applicable to courts-martial. *Jones,* 43 M.J. at 711; *see also United States v. Sutton,* 31 M.J. 11, 18 (C.M.A.1990), *United States v. Gee,* 39 M.J. 311, 312 (C.M.A. 1994). Through supplemental citations, the appellant urges us to depart from the reasoning of *Luce,* and find the issues were preserved sufficiently for appellate review notwithstanding the witness' failure to testify when the record clearly indicates what the testimony would have been had they testified. We decline to take this route and will abide by stare decisis. Further, we disagree that we could determine what the testimony in this record would have been given the nature of the cross examination. Certainly, there might be good arguments that some of the evidence discussed in the issue above would be allowed for impeachment purposes if the appellant testified. *See United States v. Swift,* 53 M.J. 439 (C.A.A.F.1999); *United States v. Sykes,* 38 M.J. 669 (A.C.M.R.1993).

### Victim Impact Evidence

■ Citing *United States v. Bellingham,* ACM 33674, 2001 WL 85786 (A.F. Ct.Crim. App. 29 Jan 2001) (unpub. op.), the appellant asserts the military judge erred when she permitted BU's father to testify, during the pre-sentencing phase of the trial, concerning the impact that the pretrial and trial process (specifically testifying at the Article 32,

UCMJ, investigation and at trial) had on his daughter. Her father told the members that the process of testifying multiple times and having to retell the story of her victimization "has been totally devastating" to BU and that "[s]he is nowhere near the same daughter that she was before."

The appellant averred, at trial, that this line of testimony essentially punished him for asserting his constitutional right to a jury trial, to cross-examine the witnesses against him, and to have the government bear the burden of proving every element of the offenses with which he was charged.

*Bellingham* was a case where the victim of a credit card theft was allowed to testify about the time he spent investigating the charges, the impact that lost time had on his military training, the problems he had correcting his credit rating, and the problems he had making future purchases. This Court found no error with any of that testimony. However, we did find problematic the victim's testimony regarding the timing of the Article 32 investigation, which interfered with the victim's departure date, his graduation, and his ability to attend to his immediate family when some members of it were ill. *Bellingham,* unpub. op. at 5.

We held the testimony was improper evidence in aggravation because the appellant had no control over the *timing* of the judicial process, and the timing did not result from the appellant's offense. *Id.* at 7. However, we did find that the victim's obligation to testify was the direct result of the appellant's crimes and was not necessarily improper as evidence in aggravation. In fact, in *Bellingham* we stated "[w]e do not hold that evidence of the adverse effect on a witness resulting from their obligation to testify at trial can never be admissible as aggravation evidence in sentencing." *Id.* at 7. Nonetheless, in dicta, we did question whether such evidence would survive a Mil. R. Evid. 403 balancing test when compared with the appellant's exercise of his constitutional trial rights. However, in that case no objection to the evidence was made at trial and the military judge did not perform the Mil. R. Evid. 403 analysis.

Rule for Courts–Martial (R.C.M.) 1001(b)(4) provides for the general principles of permissible evidence of aggravation at sentencing:

(4) Evidence in aggravation.

The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.

R.C.M. 1001(b)(4). Recently, in *United States v. Hardison*, 64 M.J. 279 (C.A.A.F. 2007), our superior court discussed the limitations on the admissibility of evidence pursuant to R.C.M. 1001(b)(4):

There are two primary limitations on the admission of aggravation evidence. First, such evidence must be "directly relating" to the offenses of which the accused has been found guilty. This rule does " 'not authorize introduction in general of evidence of … uncharged misconduct,' " *and* is a " 'higher standard' than 'mere relevance.' " The second limitation is that any evidence that qualifies under R.C.M. 1001(b)(4) must also pass the test of Military Rule of Evidence (M.R.E.) 403, which requires balancing between the probative value of any evidence against its likely prejudicial impact.

*Hardison*, 64 M.J. at 281 (citations omitted).

Although the evidence regarding the judicial process' emotional impact on BU was not uncharged misconduct, the two limitations mentioned above are appropriate. We hold under the circumstances of this case, the military judge did not abuse her discretion by permitting BU's father to testify how the multiple occasions BU had to testify impact-ed his daughter emotionally. This case was unlike *Bellingham* in that it did not involve the timing of the hearings, something that the appellant could not foresee and over which he had no control. However, it would be unreasonable for someone who commits an offense of this type to argue it is unforeseeable that the victim of a sexual assault would be called testify at a trial. Further, it would be just as unreasonable to argue that one could not foresee that the act of testifying could be emotionally difficult for a 13–year–old girl.

The military judge did consider the appellant's objection based on the *Bellingham* rational of "punishing" the appellant for asserting his rights. In response, the military judge limited the father's testimony to the emotional impact on BU of having to go through the judicial process. Thus, unlike the timing issue in *Bellingham*, the military judge limited the evidence to that which was "directly related" to the offense. Having to testify at trial, unlike the timing of the hearing itself, is directly related to, and results from, the commission of the offense.[4]

Furthermore, by limiting the testimony as she did, the military judge struck a reasonable balance between the appellant's right to a trial and the government's ability to present evidence in aggravation. She did not allow the father to testify about every possible negative effect the process had on BU. She specifically limited his testimony to the emotional impact on BU of going through the judicial process. We find that the probative value of this testimony outweighed any likely prejudicial impact.

The remaining assignment of error by the appellant and his counsel has been considered and determined to be without merit. *United States v. Matias*, 25 M.J. 356, 361 (C.M.A.1987).

### Conclusion

The findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred.

---

4. We also note that there was no differentiation made between the defense's questioning of BU as opposed to the government's. However, in this case, it is clear that the impact felt by BU was a result of the judicial process itself, and not focused on the appellant's assertion of his rights within that process.

Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and sentence are

AFFIRMED.