UNITED STATES of America

v.

**James Eugene McCOLLOUGH and Waylan Russell Dauzat.**

**Cr. Nos. 94–10004–01, 94–10004–02.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

June 1, 1994.

Assistant U.S. Atty. Lisa L. Love, Shreveport, LA, for plaintiff.

Lawrence J. Smith, New Orleans, LA, and J. Ransdell Keene, Shreveport, LA, for defendant McCollough.

J. Ransdell Keene, Shreveport, LA, for defendant Dauzat.

LITTLE, District Judge.

### RULING

For reasons to follow, we decline to dismiss the indictment against the named defendants.

## I. INTRODUCTION

The defendants were arraigned on 10 March 1994. The trial date was set for 16 May 1994. A motion to dismiss the indictment was filed on 9 May 1994. The gravamen of the defendants' complaint is that the only non-government grand jury witness, one Amanda Moore Langley ("Miss Moore" or "Moore"), testified falsely against the defendants. The defendants argue that Miss Moore was coerced to lie by threats of a lengthy prison sentence and loss of association with her children. Allegedly, two FBI agents were the font of the suborning activity. As the defendants' motion was filed only a few days before trial and required an evidentiary hearing, the court granted the defendants' motion to continue the trial and reset the trial date for 20 June 1994 in the event the motion to dismiss was denied.

The court held a hearing on the defendants' motion on 16 and 17 May 1994. At the close of two full days of testimony offered by both the defendants and the government, the court ordered the defendants' counsel to file a brief supporting the dismissal within seven days. The brief has been filed and includes exhibits that were neither offered nor filed in evidence at the hearing. That unusual and unauthorized action is of no moment in that even if the documents had been the subject of a proper offering, i.e. proper foundation, etc., they have missed their intended mark.[1]

The indictment in this matter suggests that the defendants staged automobile accidents in order to fleece money from insurance companies. Miss Moore was acquainted with both defendants. In fact, Miss Moore's sister is married to defendant Dauzat's brother. From that acquaintance stems her testimony before the grand jury on 21 April 1993, her sole appearance before that body. The court received a transcription of her testimony into evidence at the hearing.

Before the grand jury, Miss Moore stated that she had been approached by defendant Dauzat to create an accident by driving a

---

1. While on the subject of exhibits, we must summarize at this time certain actions taken by counsel for the defendants. Needless to say, the motion to dismiss based upon outrageous and illegal conduct of FBI agents is serious indeed. In his memorandum in support of the motion to dismiss, counsel for the defendants recites other terrifying conduct of one of the FBI agents. That other conduct formed the subject of a civil suit in the United States District Court for the Eastern District of Louisiana by the aggrieved party against the agent and others. Counsel attached as an exhibit to the motion to dismiss a copy of amended civil pleadings filed in the federal court in New Orleans.

After the defendants closed their case on the motion to dismiss the indictment, the government acquainted the court with the fact that the copy of the civil pleadings attached as an exhibit by counsel for defendants was not a copy of anything that had been filed nor was the pleading one that had been signed by the attorney whose name and purported signature appear on the documents. Moreover, the government presented the court with a copy of a letter submitted to the federal judge adjudicating the civil case in the federal court in New Orleans written by the attorney whose name appears on the documents. The attorney disavows preparation, or authorization of the pleadings.

This court asked the attorney for the defendants if he was aware of the fact that the exhibits filed by him were not valid copies. Counsel responded that he knew before he presented his evidence before this court that the documents were not genuine. This court then inquired as to why the attorney never informed the court that the exhibits were not as warranted by his filing and was informed by the attorney that since the exhibits had not been offered in evidence that he had no obligation to set the record straight or inform the court of the change in validity. We will deal with that indiscretion at a later date.

truck into Dauzat and McCollough. The defendants offered to split the insurance money with Moore, but she refused to be involved. Moore also testified to observing an accident confected by the defendants. She came upon a wreck immediately after the collision occurred and described the event as one obviously scripted by the defendants. The transcript of her testimony before the grand jury consists of nineteen double-spaced pages.

More recently, on 26 April 1994, Miss Moore executed an affidavit in the office of her attorney. In this affidavit she stated that she was badgered for sixteen hours while meeting with FBI agents in Lake Charles, Louisiana[2] and that during this meeting the agents threatened her with prosecution on other matters unless she would implicate defendant Dauzat. Moore also claimed that FBI agent Jerry Richardson persuaded her to give false testimony before the grand jury. She alleged that Richardson threatened her with revocation of probation for a Texas conviction and charged that she would go to jail if she refused to perjure herself before the grand jury.

After review of the evidence and the testimony, we conclude that Miss Moore's testimony of manipulation by the FBI is incredible and unbelievable. We hasten to add that we are not passing on the veracity of her testimony against the defendants. We conclude only that what she said before the grand jury was not colored in any respect by overreaching of a government agent or agency. Beyond a reasonable doubt, our appreciation of the evidence supports this conclusion. Detailed findings of fact and conclusions of law follow.

## II. THE FACTS

By her own admission, Miss Moore is a thief—a cattle thief to be exact. She has also engaged in uttering worthless checks, for which she has been arrested. During 1989 and 1990, Moore participated in the theft of cattle in various Louisiana parishes. Charges were brought against her in several parishes. All charges stemming from the cattle thefts were dropped after restitution was made. The court remains unconvinced that there was any reasonable fear of punishment or imprisonment that Moore could have experienced due to her previous cattle escapades. The FBI had no stick to stir something that could not be stirred.

To the same effect, the check writing problems had been laid to rest, with but one possible exception. Moore had no exposure on these charges because restitution had been made to the injured parties. Moore's father, Wendell Moore, testified that he supplied the funds to effectuate the restitution. In fact, Mr. Moore was the enduring savior for his daughter. He was the parent who stood by her side and assisted her in getting her black past expunged through the medium of restitution.

The noted, possible exception arose during and perhaps as a result of Miss Moore's extended stay in the home of Terry D. McBrayer in Santa Fe, Texas. McBrayer is the current and erstwhile sweetheart of defendant Dauzat. McBrayer testified at the hearing that Moore wrote unauthorized checks on McBrayer's checking account ("the McBrayer account"). The checks were payable to merchants in the Santa Fe area in payment of Moore's personal trade debts. Moore denies that her trafficking in the McBrayer account was unauthorized. According to the government, McBrayer's claim of financial intrusion is solely to have something to hold over Moore's head to restrain her from testifying against defendant Dauzat.

Moore admits that she pled no contest to charges of writing unauthorized checks on the McBrayer account but claims to have entered this plea not because she was guilty, but in order to resolve a sticky situation: She believed that if she committed no further infractions for one year, her conviction would be erased from the record.[3] At the hearing,

2. The testimony of other witnesses at the hearing did not support Miss Moore's claim that she was interrogated for sixteen hours at FBI headquarters. Miss Moore's father, for one, stated that they arrived "at dusk" and stayed until around 10 p.m.

3. Moore presents no evidence to support her belief.

Moore testified that she entered this plea in 1993. It is thus unclear whether Moore had already pled to the check charges, and as result, whether she was on probation or subject to pending charges at the time she testified before the grand jury.

Regardless of the timing of her plea, however, we are left only to ponder what possible leverage the FBI could assert concerning a charge pending or, as the case may be, a probationary sentence entered, in Texas state court. The FBI agents testifying at the hearing stated that on several occasions Moore requested that they intercede on her behalf with Texas officials, but that they told her there was little they could do. We conclude that Moore did not perceive the FBI agents as invested with authority to affect the Texas charges.

We find it particularly significant that Miss Moore never confided in her strongest supporter, her father, about the alleged FBI hardball play. It was her father who consistently made restitution for her wrongdoing, it was her father who accompanied her to visits to the FBI office, and it was her father who worked out arrangements with the parties she defrauded.[4] Yet, inexplicably, Miss Moore never told him about the FBI influence.

In the two instances in which Miss Moore signed off on written statements she made to law enforcement officers, as well as in her presentation before the grand jury, Moore acknowledges that her statements against the defendants were true and correct and freely and voluntarily given. *See* Government exh. 7 (Statement of 29 January 1990) ("I understand [my] rights, and having these

rights in mind I waive them and willingly make a statement."); Government exh. 11 (Statement of 20 January 1990) ("I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."); Government exh. 8, at 3 (Moore's Grand Jury Testimony) (After being sworn, advised "You are not required to testify before the grand jury.... [Y]ou have the right to remain silent....").

## III. THE LAW

Counsel for the defendants would have us dismiss the indictments on two related grounds. First, the defendants argue that Moore lied to the grand jury and that the presentation of her falsehood was prejudicial. Moore's alleged motivation for lying lies in her fear of imprisonment caused by the threats of FBI officials.[5] Second, the defendants argue that the government failed to disclose to the grand jury information concerning its star witness's criminal past and that this failure was prejudicial. In other words, on this second ground, the defendants argue that the Assistant United States Attorney responsible for presenting the government's case to the grand jury knew that Miss Moore's reputation for truth and veracity was brittle, but that she failed to disclose this impeachment evidence at the time of Moore's testimony.

In view of the grand jury's broad investigatory powers and "duty not to determine guilt or innocence but to determine whether probable cause exists to believe that crime has been committed," courts have sharply limited defendants' ability to challenge the

4. Mr. Moore claims to have spent nearly $100,000 making restitution on his daughter's behalf. Mr. Moore's former wife disputes that sum, as does Miss Moore—both on rebuttal. Neither, however, disputes the fact that Mr. Moore was the source of the restitution or the implication that without his unflagging assistance, his daughter would have remained in deep trouble.

5. Further, much was made at the hearing over Miss Moore's allegations that FBI agent Richardson remained in the grand jury room during her testimony. Significantly, not one mention of that allegation, or its consequence if true, is made in the defendants' brief. The court reporter who recorded the grand jury session testified. He has

appeared countless times at grand jury sessions and knows the taint attached when one other than the witness, the U.S. Attorney, and the grand jury members remains in the hearing room. We believe the reporter when he stated that had Mr. Richardson remained in the room during Moore's testimony that he would have noted that presence in his transcript after first alerting the foreman of the situation. We are convinced that Mr. Richardson was not present during Moore's testimony before the grand jury. Thus, we do not have to consider the consequence of being present as proscribed by Fed. R.Crim.P. 6(d).

nature of evidence presented. *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir.1985) (citing *United States v. Calandra*, 414 U.S. 338, 349, 94 S.Ct. 613, 620–21, 38 L.Ed.2d 561 (1974)); *see also Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (court may not inquire into the sufficiency or competency of evidence supporting a facially valid indictment). They have not, however, eviscerated a defendant's ability to object to an indictment founded upon egregious prosecutorial misconduct. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 261, 108 S.Ct. 2369, 2377, 101 L.Ed.2d 228 (1988). Thus, for example, while the presentation of evidence to the grand jury that eventually turns out to be unreliable may not serve as a basis for dismissing an indictment, the knowing presentation of false evidence may. *United States v. Williams*, — U.S. —, —, 112 S.Ct. 1735, 1746, 118 L.Ed.2d 352, 370 (1992); *United States v. Spillone*, 879 F.2d 514, 525 (9th Cir.1989); *see also United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981) ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured.").

 As previously stated, the court has found that Miss Moore was not induced to testify falsely through the efforts of anyone on the government's team—the Assistant U.S. Attorney, FBI agents, or any state official. Thus, Moore's stated motive for perjury is without a soupçon of verity, and the court gives no weight to her recent claim of perjury. More important, however, the court concludes that at no time was there any reason for any member of the government team to believe that Moore was lying when she reported the involvement of the defendants in a scheme to defraud an insurance company. Over a three year period, and until one month ago, Moore held steadfastly to the account she gave before the grand jury. Moore's recent recantation thus does not warrant dismissal of the indictment.

Furthermore, the court concludes that the government's failure to present evidence of Miss Moore's criminal history to the grand jury does not justify dismissal. As stated, dismissal is only supported where there is shown prejudice to the defendant by an intentional disregard of the defendant's rights by a member of the government's team. Failure to disclose exculpatory or impeachment evidence is not such a violation. *United States v. Williams*, — U.S. at —, 112 S.Ct. at 1744, 118 L.Ed.2d at 368 (1992) ("[I]t has always been thought sufficient to hear only the prosecutor's side. As Blackstone described the prevailing practice in 18th-century England, the grand jury was 'only to hear evidence on behalf of the prosecution[,] for the finding of an indictment is only in the nature of an enquiry or accusation, which is afterwards to be tried and determined.'" (citation omitted)).

## IV. CONCLUSION

Accordingly, we find no grounds justifying dismissal of the indictment and deny the defendants' motion. This matter will proceed to trial as scheduled on 20 June 1994.